**UNITED STATES of America,**

v.

**Edward J. BRENNAN, Jr.**

**No. CR 65–329.**

United States District Court
N. D. Ohio, E. D.
March 9, 1966.

Merle M. McCurdy, Dist. Atty., James M. Oakar, Asst. Dist. Atty., Cleveland, Ohio, for plaintiff.

James J. Carroll, Cleveland, Ohio, for defendant.

CONNELL, Chief Justice.

Defendant Edward J. Brennan was indicted for having unlawfully possessed, on September 21, 1965, a British submachine gun and a homemade copy of a United States submachine gun, neither of which was registered according to law.

Defendant brings his Motion to Suppress Evidence on the ground that the search of his home was in violation of his constitutional rights and express holdings of federal courts. He alleges that the federal officers had *no* search warrant; that they illegally arrested him for an offense he did not commit; that the arrest warrant which the agents served upon him did not issue upon a proper showing of probable cause and was thus illegal so that any search incident to that arrest is tainted with illegality; that he was unlawfully coerced to sign a document which had been pre-typed by the officers and which purported to authorize them to search his home, a document which he could neither see nor read when it was presented to him.

To appraise the merits of these contentions, this Court conducted a two day hearing during which evidence was presented from which the Court finds the following facts: Defendant was a machine gunner in the United States Army, in World War II; that he had been licensed to deal in guns during the past ten years. He had been a city fireman in his community for some years but the salary was so low he quit and operated a body and fender repair shop of his own, dealing in guns as an avocation. He was married, had a large family, had never been in any trouble, and moved to a small farm thirty miles from Cleveland to improve conditions for his family.

Some three years before the time in question, in 1962, defendant had sold two rifles to one William Vanderlinde but had not seen him since. Vanderlinde was recently arrested in Parma, Ohio for a serious state offense; he then offered to take the Parma police to a submachine gun which he had concealed in a woods. When he did so the police seized the weapon, and federal agents were then called, to whom Vanderlinde made the statement that defendant Brennan had sold him said submachine gun. Both counsel for Brennan and the government now agree that such statement and accusation were absolutely and flagrantly false.

Vanderlinde was charged with a federal offense and the agents photographed the machine gun for the apparent purpose of its use in interrogating Brennan. A telephone call to Washington at this point would have informed the agents that defendant had never had contact with the weapon. Such a phone call was made by the agents the day *after* their pre-dawn raid, the day *after* they sought the arrest warrant, and they were so informed that the defendant had had no contact with the incriminating weapon. Likewise, a telephone call by the agents to the manufacturer whose name appeared on the weapon would have supplied the same information. None was made.

■ After the false accusation against Brennan by Vanderlinde, Agent Ralph K. Smylie investigated to find out where defendant resided. He found the defendant's shop and learned that he had moved to a small farm in Wellington; he called the defendant's home, talked to his wife and asked her if Vanderlinde knew her husband. He was told that the defendant had sold Vanderlinde two rifles some three years before. Such information was considered by Agent Smylie as corroboration of the accusation of Vanderlinde that defendant had sold him a submachine gun in violation of law. Therefore, when Agent Smylie sought an arrest warrant against the defendant on the hearsay accusation of Vanderlinde, he had no corroboration at all. When he told the Commissioner he had corroboration of the accusation against the defendant he was very much in error. There was here no corroboration whatsoever of the charge of having unlawfully sold a machine gun. No effort had been made to procure the very proper corroboration which either of two telephone calls would have elicited. The information which Mrs. Brennan gave Agent Smylie the evening before as to the sale of two rifles to Vanderlinde some years before was completely ignored—because the agent had rather spectacular plans for her family at a "time when the features of the human countenance could not be distinguished by natural light."

The Brennans live in Wellington near the Grafton State Prison Farm. When a number of cars with flashing lights made a very noisy entrance into his driveway, the defendant awakened, saw faces at his window, asked "if some prisoners had escaped," and was told to come to the rear porch. It was still very dark. It was a little after 5:00 A.M. Defendant came out clad only in a pair of pants. Immediately he had flashlights in his face, was surrounded by men with guns, and was told by the agents six times that he was under arrest. They also said "We want to come in your house." One held up a picture of the Vanderlinde machine gun and said "You sold this machine gun." Defendant had their lights in his eyes and he did not have his glasses on. They then inquired "Remember who you sold it to?" Defendant denied ever selling the weapon. They then said "We want to come in. We want you to sign this paper." Defendant told them his children were asleep, to which the agents replied "Sign this and we won't disturb the kids." Defendant was very disturbed and agitated, and hesitated about signing the paper with which he was presented.

From defendant's small rear porch some steps lead to the ground, and the pre-prepared consent form was placed on one of the steps. Here the defendant signed the document, placing his signature at a 45 degree angle from the signature line, which is some evidence he didn't see the line and some evidence he couldn't read the document.

Thereupon three agents and one marshal entered the house. Many weapons were found, including the two weapons described in the indictment. Defendant admits he failed to register, or to pay the tax on, either of these two weapons, but states frankly that he could not afford to pay the tax.

Agent Smylie explains making this arrest under pre-dawn conditions as an accommodation to the defendant! Agent Smylie was afraid that if he didn't arrest him at that early hour defendant could not have been processed through the Commissioner's hearing in time to be released later on the 21st so defendant would not have to stay in jail that night. We do not find the agent quite that compassionate. We do not find such excuse to be true. The agent's plans did fill much of the day but we find that compassion had no part in it.

The agents, including Agent Smylie, were very loud and disrespectful towards Mrs. Brennan and argued with her, whereupon the marshal ordered them to "Stop it." The recurring intervention of Deputy Marshal Rooney spared this couple further discourtesy from Agent Smylie and his men.

The agents went through the house but the weapons they found, lawful and unlawful, were all in plain view. There were several inoperable machine guns, including two attached to a plane in the barn which defendant used for exhibition purposes at fairs.

I find that Agent Smylie asked the defendant to demonstrate that one of these weapons was operable, whereupon the weapon was taken to the yard outside the house while defendant operated the machine gun for them! This would be a most dangerous thing to do if the operator was at all dangerous.

Having ransacked the petitioner's premises to their satisfaction, the agents (again at the adamant suggestion of Deputy Marshal Rooney) permitted the petitioner to dress, shave and have his breakfast. Thereupon they drove him to Cleveland, stopping en route at his shop to confiscate his gun license. He remained in custody all that day while the agents interrogated him. At about 3:30 P.M. he was told (with reference to the Commissioner) "He's waiting for us; he'll have to wait for us." At about 4:00 P.M. Agent Smylie told the defendant "We could have picked you up later and you would have spent the night in jail." The defendant was then told that they "had to have a statement or we can't go to the Commissioner." When asked why he signed, Brennan said "I didn't want to spend the night in jail."

In challenging the Government's right to employ the evidentiary fruits of the

search of his home, the petitioner has mounted a three-pronged attack: (1) He claims that the arrest warrant was not predicated upon a satisfactory showing to the Commissioner that there was probable cause to believe that the petitioner had committed the offense with which he was charged, so that the warrant was invalid, the arrest illegal and any search incident to that arrest is tainted with that illegality; (2) Even if the warrant of arrest be deemed valid, it was executed in an unreasonable and coercive fashion, and the ensuing search was so oppressively unreasonable as to run afoul of the proscription of the Fourth Amendment against unreasonable searches and seizures; (3) The petitioner's act of signing the consent-to-search form was the product of intimidation and fear rather than the freely acknowledged waiver of a constitutional right.

■ Our first determinative question requires that we weigh the propriety of the Commissioner's action in issuing a warrant for the arrest of the accused. We note at the outset that the action by the Commissioner in issuing a warrant is presumptively correct and his action must stand unless it is shown that he was clearly erroneous. We are also mindful of the Supreme Court's admonition that—

[A]ffidavits for * * * warrants * * * must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting. United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

A commissioner, in deciding whether to honor the government's request for the issuance of a warrant, is governed by the principles enunciated by the Supreme Court in Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed. 2d 1503 (1958):

* * * the inferences from the facts which lead to the complaint [must] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * The purpose of the complaint, then, is to enable the appropriate magistrate, here a Commissioner, to determine whether the "probable cause" required to support a warrant exists. The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.

As we stated in United States v. Raidl, 250 F.Supp. 278 (N.D.Ohio 1965):

The point, then, is not merely whether probable cause existed for the issuance of this warrant, but whether [the agent] informed the Commissioner of facts sufficient for the Commissioner to determine whether probable cause existed.

■ The affidavit may, as here, be predicated upon hearsay evidence from a government informer and need not reflect solely the direct personal observation of the affiant-agent (Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L. Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960)), but the magistrate—

* * * must be informed of some of the underlying circumstances from which the informant concluded that the [contraband articles] were where he claimed they were, and some of the underlying circumstances from which the officer con-

cluded that the informant * * * was "credible" or his information "reliable." Otherwise, "the inferences from the facts which led to the complaint" will be drawn not "by a neutral and detached magistrate," as the Constitution requires, but instead, by a police officer "engaged in the often competitive enterprise of ferreting out crime, Giordenello v. United States, supra, [357 U.S.] at 486 [78 S.Ct. 1245, at 1250]; * * or, as in this case, by an unidentified informant. Aguilar v. State of Texas, 378 U.S. 108, 114–115, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964).

In short, there must be—

* * * some supporting information concerning the credibility of informants in narcotics cases or other common garden varieties of crime * * * [A] magistrate is intended to make a neutral judgment that resort to further criminal process is justified. A complaint must provide a foundation for that judgment. It must provide the affiant's answer to the magistrate's hypothetical question, "What makes you think that the defendant committed the offense charged?" Jaben v. United States, 381 U.S. 214, 224, 85 S.Ct. 1365, 1370, 14 L.Ed.2d 345 (1965).

In the instant case the only probative fact in Agent Smylie's affidavit is the accusation leveled against the accused by one William Vanderlinde who, after his apprehension by police, admitted possession of the weapon which formed the basis for the charge against the defendant Brennan. Vanderlinde claimed that Brennan had sold him the weapon. There is no other corroborative fact to link the accused Brennan with the alleged sale of the unregistered automatic weapon to Vanderlinde. The sole basis, then, for Agent Smylie's affidavit is the unsupported accusation by an apprehended felon with a long history of criminal activity. The Commissioner was given no fact upon which *he* could determine that the informant was reliable.

■ Agent Smylie's flimsy attempts at establishing corroboration involved a telephone call and a receipt for the sale of a rifle. A telephone call was placed to the wife of the accused, in which she stated that her husband had guns for sale and had been in the business of selling guns and had sold two rifles to Vanderlinde three years before. There was no evidence before the Commissioner to indicate that any of these weapons were unregistered or had been assembled in violation of any federal law. The Government contends that a receipt for the sale of a weapon from Brennan to Vanderlinde credits the story of Vanderlinde and forms the basis from which the Commissioner could conclude that he was reliable. The receipt hardly supports the charge of illegal transfer of a firearm. If anything, the receipt indicates that Brennan would *not* transfer a weapon illegally, since the evidence indicates that the prior transaction was made strictly in accordance with law. Thus, since Vanderlinde "had never before given information" and the agents had failed to corroborate any part of it, Agent Smylie "had no basis in experience for confidence in the reliability" of Vanderlinde's accusation. Wong Sun v. United States, 371 U.S. 471, 480, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). He never should have asked for a warrant.

In all reported cases wherein a "tip" from a source whose reliability had not been pre-established formed the basis for an arrest, reviewing courts have found that probable cause was lacking. In Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the sole predicate for the defendant's arrest, other than the officer's knowledge that he had a police record, was the fact that the officer—

* * * had "information" that he had "heard reports," that "someone specifically did relate that information," and that he "knew who that person was." There is nowhere in the record any indication * * * from what source the "information"

and "reports" had come. 379 U.S. 89, 94, 85 S.Ct. 223, 227.

The Supreme Court concluded its opinion thus:

> It is possible that an informer did in fact relate information to the police officer in this case which constituted probable cause for the petitioner's arrest. But when the constitutional validity of that arrest was challenged, it was incumbent upon the prosecution to show with considerably more specificity than was shown in this case what the informer actually said, *and why the officer thought the information was credible*. We may assume that the officers acted in good faith in arresting the petitioner. But "good faith on the part of the arresting officer is not enough." 379 U.S. 89, 96, 85 S.Ct. 223, 229.

Similarly, in Collins v. Beto, 348 F.2d 823, 827 (5th Cir. 1965), "The only information offered as supporting Collins' arrest in this case, E. T. Morgan's 'tip,'" proved to be insufficient in law to support the arrest.

In United States v. Whitlow, 339 F.2d 975, 979 (7 Cir. 1964) the objectionable evidence had been seized in the execution of a search warrant which had issued upon a government agent's affidavit which related that two of the defendant's accomplices had named the defendant as their accomplice and had claimed that the proceeds of the robbery were cached in Whitlow's home. The agents had obtained no corroborative information to support the accusation by these two who had admitted their guilt. Neither had ever given information before. The Seventh Circuit Court of Appeals held that the affidavit of Agent Semlow was insufficient to support the issuance of the warrant.

> The information which the Commissioner received from Semlow's affidavit was the rankest sort of hearsay. In the first place, the affidavits alleged to have been made by Harris and Jordan were not shown to the Commissioner, and the manner and means by which Semlow obtained the information disclosed therein is not revealed. Thus, we have a situation where Semlow informed the Commissioner that Harris told him that O'Dell told her that Whitlow's wife received $3,000 in cash and a ring for her part and that Whitlow received money for his part. There was no showing by Semlow that he had any reason to believe that his informants, Jordan and Harris, were "credible or their information reliable." On the contrary, the affidavits disclose that Jordan was an admitted thief and Harris an accomplice.

This cursory review of the above cited authorities in preparation for the appraisal of the affidavit in the instant case compels the conclusion that the Commissioner acted without legal justification in authorizing the arrest of Edward Brennan. There was nothing to corroborate the accusatory story of Vanderlinde. For a warrant to issue on information furnished by a first-time informer whose reliability is not pre-established, the agents must show to the Commissioner some additional corroborative fact *relating to the offense charged* which might lend some credence to the informer's tale. The only corroboration they had consisted in learning where this defendant lived! This is especially true when an apprehended felon seeks to point the finger of blame at another party. Upon such anemic evidence, agents may not rush headlong for a warrant of arrest, and thus trigger the awesome machinery of legal process against an individual.

We find that the warrant of arrest is invalid, so that the arrest of the petitioner is illegal. Since the initial presence of government agents on petitioner's property is illegal, it follows that every subsequent step in the investigative process is permeated with the taint of this illegality, and all evidence must be suppressed. Wong Sun v. United States, supra. Our finding on this initial argument of the defendant makes unnecessary

a detailed discussion of the other two predicates of his motion; it is sufficient to say that the Court is in agreement with the petitioner on both points. We find that defendant Brennan was coerced and deceived into signing a search warrant against his own home under conditions by which he could not read, see or properly sign, under all the psychologic compulsions Agent Smylie could bring to bear in the terror of his pre-dawn raid upon this home.

There is no question here but that defendant had violated the law by not registering and paying taxes on two submachine guns in this collection, the second of which he had made in his own shop. Nor is there any question here but that Agent Smylie had no corroboration whatsoever of Vanderlinde's accusation against defendant when he procured an arrest warrant against defendant. By pretending that learning a man's address constituted corroboration of the claim that he had sold a machine gun unlawfully, Agent Smylie procured an arrest warrant unlawfully, in which process he deceived the Commissioner into believing he had corroboration.

To use a warrant thus falsely procured for the purpose of this pre-dawn invasion of this family's home and privacy, and then, in the darkness of his backyard, to intimidate this man clad only in a pair of pants, into issuing a pre-prepared search warrant against his own home, under all these conditions and surroundings, and under the fear generated by the claim he had sold a machine gun unlawfully, constituted a violation of this defendant's constitutional rights. It was a form of planned psychological intimidation no agent has a right to utilize and of which no court may approve.

The entire procedure was unlawful and deliberately calculated in advance to deprive the defendant of his constitutional rights. It succeeded in doing so. It was a mere coincidence that this defendant was violating the law, but it was no coincidence that Agent Smylie figured out a clever method of depriving people of their constitutional rights by terrorizing them and their families in the darkness of the night with lights, guns, intimidation, false accusations, and a suggestion to go into the house of the victim. Such an attack on the constitutional rights of citizens cannot be tolerated or condoned by the Court.

Defendant violated a law, which was harmful because laws should be obeyed. But Agent Smylie and his men, in purporting to enforce the law, did something far more heinous than the crime which they claimed to have been suppressing. Smylie violated the supreme law of the land on which the rights of all depend, and he did so with all the preparation and premeditation it took to invent, pre-prepare and to utilize this means of attempting to deprive defendant Brennan and his family of their constitutional guaranties against the improper search of their home. Our Constitution was intended as a Shield for our citizens. The Court must resist its attempted use by Agent Smylie as a Sword. Without it we would have neither law nor country. America once fought a revolution primarily because this right was trifled with. Laws should be enforced by men who believe in this right and who do not invent clever methods of pretending it no longer exists. We are in sympathy with the sentiments expressed in Collins v. Beto, supra, 348 F.2d at 831, 832:

> The rebuke that "[t]he criminal is to go free because the constable has blundered" People v. Defore, 1926, 242 N.Y. 13, 21, 150 N.E. 585, 587 (Cardozo, J.), cert. denied 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784, was long the shibboleth of the opponents of the exclusionary rule in a debate which has now been authoritatively resolved. It is indisputably a policy of our society that criminals be speedily apprehended and justly convicted. But in pursuing this aim we must sedulously avoid prejudicing other, and higher, goals. One such goal is certainly a cutting down of the incidence of unlawful conduct against private persons by public officials.

"In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." Olmstead v. United States, 1928, 277 U.S. 438, 485, 48 S.Ct. 564, 575, [72 L.Ed. 944] 66 A.L.R. 376 (Brandeis, J., dissenting.)

Public brutality breeds private brutality, and private brutality breeds public brutality; regardless of which is the chicken and which the egg, the circle must be broken. The public sector cannot wait for the private sector to take the initiative. So far as the obligation falls to the lot of the federal courts to play a part they must not retreat from the duty of using the only means at their command to bring to an end unlawful arrests and other violations of fundamental rights. This means is to set aside convictions, whether they be by state or federal courts, that are based on such denials on the part of public officials of the constitutional rights of the individual.

The Marshal will destroy those weapons held in evidence on which tax should have been paid and which should have been registered. The Marshal will return to defendant Brennan the weapons and parts of weapons not required to have been registered by the United States and on which no tax was due the United States.