## COMMONWEALTH *vs.* ANTHONY G. SAVILLE.

Hampden.   December 4, 1967. — January 3, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
SPIEGEL, & REARDON, JJ.

*Search and Seizure.  Counterfeiting.  Bank and Banking.  Federal Reserve
Bank.  Money.  Practice, Criminal,* Variance.  *Words,* "Money,"
"Issued."

The affidavits in several applications for search warrants presented by the
same police officer to the same court clerk at the same time with respect
to one criminal transaction might properly be considered as a group
in determining the validity of one of the warrants issued.  [460–461]

A warrant to search a printing shop of a defendant charged with possession
of counterfeiting equipment with intent to use it and possession of
counterfeit paper money with intent to "utter and pass" it was suffi-
ciently supported by affidavits based on statements made to the affi-
ant by a Connecticut police officer showing that a certain person had
said to the Connecticut police officer that the defendant had given
that person counterfeit money at the printing shop, and that the same
afternoon that person had been arrested in Connecticut for uttering
counterfeit money and when arrested had counterfeit money in his
possession.  [461]

Federal Reserve notes are "issued" by an "incorporated banking com-
pany" within G. L. c. 267, § 8, and by a "bank" within § 13;  and the
possession of ten or more counterfeit Federal Reserve notes with intent
to "utter and pass" them, and the possession of certain equipment
with intent to use it to make such counterfeit notes, are crimes within
§ 9 and § 13, respectively.  [461–462, 464]

There was no fatal variance between indictments for possessing equip-
ment for counterfeiting Federal Reserve "notes and bills" and possess-
ing counterfeit Federal Reserve "bills," and proof showing that the
cases dealt with counterfeit Federal Reserve notes.  [465]

Two INDICTMENTS found and returned in the Superior
Court on September 15, 1966.

Motions to suppress were heard by *Macaulay*, J., and the
cases were tried before him.

*Reuben Goodman* for the defendant.

*Leonard E. Gibbons*, Assistant District Attorney (*Matthew
J. Ryan, Jr.*, District Attorney, with him), for the Com-
monwealth.

CUTTER, J.  Saville under two indictments was charged with (1) unlawfully possessing with intent to use certain equipment listed in G. L. c. 267, § 13, for the purpose of making counterfeits of "notes and bills . . . issued by the Federal Reserve Bank of the United States" and (2) unlawfully possessing "with intent to utter and pass" ten or more "counterfeit bank bills . . . purportedly issued by the Federal Reserve Bank of the United States . . .." See G. L. c. 267, § 9.  The trial was conducted under G. L. c. 278, §§ 33A–33G, as amended.  He was found guilty on both charges.  Saville appealed.  He assigns as error the denial of his motions (1) to suppress certain evidence and (2) for directed verdicts.

1. Saville, prior to trial, sought to suppress evidence seized at his printing shop under a search warrant issued on July 4, 1966, pursuant to an application on that day by Officer Desrosiers of the West Springfield police.  The application reads, in part, "I have information based upon . . . statements made to me by Detective Richard Hurley of the Connecticut State Police that John J. Parisi had stated that Anthony Saville of 38 Burford Avenue, West Springfield gave said Parisi 150 counterfei[t] ten dollar bills, this occurring at the print shop of said Saville located at 212 Bosworth Street in West Springfield yesterday afternoon."  The officer concluded that "there is probable cause to believe" that Saville unlawfully possessed at his print shop counterfeit $10 bills as well as certain items of printing equipment capable of producing such bills.

At the pre-trial hearing before the judge who later presided at the trial, Saville's attorney introduced in evidence only (1) a warrant to search 212 Bosworth Street, (2) the affidavit (quoted above) of Officer Desrosiers, and (3) a form of notice, dated July 14, 1966, of proposed forfeiture of the articles seized under the warrant as "property used in the commission of a crime."  The motions to suppress, however, alleged that when Officer Desrosiers made application for the warrant to search 212 Bosworth Street, he also made "applications . . . for two other search warrants,

which . . . contained affidavits [by Officer Desrosiers] . . . inconsistent with . . . information set forth in the affidavit" upon which the warrant to search 212 Bosworth Street was based. Copies of these affidavits were attached to each motion to suppress (as examination of the original motions reveals).[1] These affidavits and the warrants based upon them were also dated July 4, 1966, and were issued by the same clerk who issued the warrant to search the Bosworth Street premises.

This is another instance, like some recent cases,[2] where the police, although perhaps aware of facts amounting to probable cause, seem to have set their information out in the required affidavit for the particular warrant (see G. L. c. 276, § 2B, as amended through St. 1965, c. 384) less completely than would have been appropriate. In this case, however, the information in all the affidavits presented to the clerk on July 4, 1966, adequately revealed the facts relied upon to show probable cause. *United States* v. *Serao,* 367 F. 2d 347, 348–349 (2d Cir.). We thus need not discuss whether the affidavit in support of the application relating to 212 Bosworth Street was sufficient by itself.

This last mentioned affidavit and the affidavits (see fn. 1) in support of the applications concerning Parisi's premises were obviously presented by the same police officer to the same clerk at the same time as a part of a single effort to obtain search warrants relating to one counterfeiting transaction. We think that the affidavits may be considered

[1] These affidavits, part of applications for warrants to search Parisi's apartment and place of employment, read, in part, as follows: "I have information based upon . . . statements made to me by Detective Richard Hurley of the Connecticut State Police, Westbrook Barracks that on July 3, 1966 one John P. Parisi of 38 Burford Avenue, West Springfield, was arrested in Old Lyme, Connecticut, on ten counts of uttering counterfeit ten dollar bills, and that at the time of his arrest the said Parisi had in his possession forty counterfeit ten dollar bills all bearing serial #A-13705685 – D. The said Parisi has a prior record for uttering forged checks in this Commonwealth. . . ."

[2] Compare, e.g. (a) *Commonwealth* v. *Rossetti,* 349 Mass. 626, *Commonwealth* v. *Mitchell,* 350 Mass. 459, *Commonwealth* v. *Monosson,* 351 Mass. 327, and *Commonwealth* v. *Penta,* 352 Mass. 271, 274, with (b) *Commonwealth* v. *Lepore,* 349 Mass. 121, *Commonwealth* v. *Owens,* 350 Mass. 633, 635–636, *Commonwealth* v. *Moran, ante,* 166 and *Commonwealth* v. *Cuddy, ante,* 305, 307–308.

as a group and that, so viewed, they establish (1) that Parisi had told a Connecticut State police officer that Saville had given Parisi 150 counterfeit $10 bills at Saville's printing shop on the afternoon of July 3, 1966, and (2) that Parisi had been arrested on July 3, 1966, on charges concerning counterfeit $10 bills with forty such bills in his possession at the time of his arrest. These facts, taken together, had substantial tendency to show that counterfeit money had been obtained at the printing shop and that one who had such money in his possession in incriminating circumstances had obtained the money there from Saville. Although the information about Parisi in the application for the Bosworth Street warrant was somewhat meager, even that application by itself showed that Parisi admitted receipt of counterfeit bills from Saville at his shop. "Incriminating admissions by one who asserts participation [in criminal activity] tend to show the reliability of his statements." *Commonwealth* v. *Owens,* 350 Mass. 633, 635–636. See *Commonwealth* v. *Lepore,* 349 Mass. 121, 123. If it be assumed that Parisi did not in terms assert participation in the counterfeiting venture, involvement in it was inferable from what he was reported as admitting to the Connecticut officer. It was sufficient to warrant treating that admission as reliable. See *United States* v. *Bozza,* 365 F. 2d 206, 225 (2d Cir.); *United States* v. *Wood,* 270 F. Supp. 963, 966–967 (S. D. N. Y.). Cf. *United States* v. *Whitlow,* 339 F. 2d 975, 976–980; *United States* v. *Brennan,* 251 F. Supp. 99, 104 (N. D. Ohio).

We apply the principle stated in *United States* v. *Ventresca,* 380 U. S. 102, 108–109, that warrants and affidavits in support of them must be tested "in a commonsense and realistic fashion." The motions to suppress were properly denied.

2. Saville contends that verdicts should have been directed for him because "[t]he possession of ten or more counterfeit . . . Federal Reserve notes and the possession of equipment to counterfeit such notes are not crimes under G. L. c. 267, § 9, or . . . § 13." These and other relevant sections are

set forth in the margin.[3]  He argues in effect that §§ 9 and 13 do not apply to counterfeit Federal Reserve notes, because such notes are not issued by "an incorporated banking company" within the meaning of that term used in § 8, and within the meaning of the term "issued by any bank or banking company" used in § 13.

Section 9 makes it a crime to possess (in specified circumstances) with intent to pass ten or more "counterfeit notes . . . such as are mentioned in any of the preceding sections." Section 8 refers to "a bank bill . . . issued by any incorporated banking company." Section 13 makes it

[3] General Laws c. 267 is entitled in the Tercentenary Edition, "Forgery and Crimes against the Currency." The sections here pertinent are (emphasis supplied): "Section 1. Whoever, with intent to injure or defraud, falsely . . . counterfeits . . . a charter, deed, will . . . *bond or writing obligatory,* power of attorney . . . *bill of exchange or promissory note;* or an order . . . or discharge . . . shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years. . . . Section 5. Whoever, with intent to injure or defraud, utters and publishes as true a . . . forged . . . record, deed, *instrument or other writing mentioned in the four preceding sections,* knowing the same to be . . . forged . . . shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years. . . . Section 8. Whoever, with intent to injure or defraud, falsely . . . counterfeits *a bank bill or promissory note payable to the bearer thereof . . . issued by any incorporated banking company,* shall be punished by imprisonment in the state prison for life or for any term of years. Section 9. Whoever has in his possession at the same time ten or more similar . . . counterfeit notes, bills of credit, bank bills or notes, such as are mentioned in *any of the preceding sections,* payable to the bearer thereof . . . knowing the same to be . . . counterfeit, with intent to utter or pass the same as true, and thereby to injure or defraud, shall be punished by imprisonment in the state prison for life or for any term of years. . . . Section 13. Whoever engraves, makes or mends, or begins to engrave, make or mend, a plate, block, press or other tool, instrument or implement, or makes or provides paper or other material adapted to and *designed for the forging* or making *of a* false and counterfeit note . . . purporting to be issued . . . for a debt of the commonwealth, or a false and *counterfeit note* or bill *in the similitude of the notes* or bills *issued by any bank or banking company* and *whoever has in his possession such a plate or block engraved* in any part, *or a press or other tool* . . . or paper or other material, adapted and designed as aforesaid, *with intent to use the same* . . . in forging or making such false and counterfeit . . . bills or notes, shall be punished by imprisonment in the state prison for not more than ten years, or by a fine of not more than . . . [$1,000] and imprisonment in jail for not more than two years. . . . Section 29. Whoever . . . utters or circulates a shop bill or advertisement . . . in . . . appearance, like a *treasury note, note,* certificate . . . or other security *issued . . . by or on behalf of the United States,* on paper similar to paper used for the same, respectively, and with vignettes, figures or decorations used thereon, or having the general appearance of a treasury note, note, certificate . . . or other security issued . . . by or on behalf of the United States, shall be punished by a fine of not more than fifty dollars or by imprisonment in jail for not more than three months."

a crime to possess with intent to use certain items of equipment designed for making "counterfeit[s of] notes . . . issued by any bank or banking company."

Federal Reserve notes are "obligations of the United States," see 12 U. S. C. §§ 411–414 (1964; see 1966 amendment of § 413 by 80 Stat. 161), which may be issued to each of the twelve Federal Reserve banks (see 12 U. S. C. § 222, App. A (1964), and 26 Fed. Reg. 12638) against statutory collateral deposited by such banks (§§ 412–414), "at the discretion of the Board of Governors of the Federal Reserve System" (§ 411; see also § 248 [d] as amended by 80 Stat. 161). The notes then may be put in public circulation by the several Federal Reserve banks. Notes "so paid out . . . bear . . . a distinctive letter and serial number . . . assigned . . . to each Federal Reserve bank" (§ 413).[4] Such notes are receivable by member banks of the Federal Reserve System and for all taxes (§ 411), so they have most characteristics of money. See for a general discussion of these notes, Nussbaum, Money in the Law (rev. ed.) pp. 91–92.

We assume that the delivery of a Federal Reserve note to one of the twelve Federal Reserve banks is "the first delivery . . . to a holder or remitter," the sense in which "issue" is used in the Uniform Commercial Code. G. L. c. 106, § 3–102 (1) (a). Article 3 of the Code, however, does not apply to "money," see § 3–103 (1), which is defined as "a medium of exchange authorized . . . by a domestic . . . government as a part of its currency." See § 1–201 (24). Federal Reserve notes are "money" within this definition, as the official comment (see Am. Law Inst. Uniform Commercial Code, 1962 Official Text, p. 28) on clause (24) reveals. In any event, having in mind the obvious statutory purpose behind § 8 (to punish the proscribed possession of counterfeits of notes used as currency put out to the public by banks), it is consistent with that purpose and with

---

[4] The counterfeits, like the genuine $10 Federal Reserve notes, bear on the left hand side of the black ink face a black circle with a capital A in the center, and, on the circle, the words "Federal Reserve Bank of Boston, Massachusetts."

ordinary usage to view "issued" as including the action of the several Federal Reserve banks in putting into public circulation Federal Reserve notes obtained by them for that purpose under the Federal statutes cited above. Similarly, such an interpretation of "issued," as found in § 13, is appropriate. Federal Reserve banks are incorporated under 12 U. S. C. § 341 (1964). We thus hold that Federal Reserve notes are "issued by an incorporated banking company" within G. L. c. 267, § 8 (fn. 3), as well as by a "bank," within § 13.

Our conclusion renders it unnecessary to consider at length Saville's argument that the statutory and decisional history of G. L. c. 267, §§ 1, 8–13, indicates that counterfeiting a bank note, upon which an incorporated banking company was not directly liable (or a note within c. 267, § 7), could be prosecuted only under § 1. Section 1 has been regarded as having a wide scope. See *Commonwealth* v. *Carey*, 2 Pick. 47, 49; *Commonwealth* v. *Woods*, 10 Gray, 477, 480–482. We assume, without deciding, (1) that § 1, which carries a lesser penalty than §§ 9 and 13, would apply to counterfeiting any type of bank note or currency not more specifically made an offence in one of the later sections of c. 267, and (2) that § 1 (under the holding in *Commonwealth* v. *Dole*, 2 Allen, 165, 167–168; but see *Commonwealth* v. *Paulus*, 11 Gray, 305) would not apply where a counterfeit of any note more explicitly described in one of the later sections was involved.[5]

---

[5] Nothing in the earlier forms of c. 267, §§ 1 and 7–13, or in the periodic minor revisions of these statutes, requires a different result. See St. 1804, c. 120, discussed in *Brown* v. *Commonwealth*, 8 Mass. 59, 69–71. See also Rev. Sts. c. 127, §§ 1, 4, 5, 9 (see discussion of §§ 2 and 6 in *Commonwealth* v. *Simonds*, 14 Gray, 59, 60–61); Gen. Sts. c. 162, §§ 1, 4, 5, 9; Pub. Sts. c. 204, §§ 1, 4, 5, 9; R. L. c. 209, §§ 1, 5, 6, 9, 10. Perhaps, because most prosecutions concerning counterfeits of United States notes take place in the Federal courts under 18 U. S. C. §§ 8, 471–474 (1964), the Massachusetts statutes have not been brought up to date to refer expressly to modern types of United States notes. Cf. Am. Law Inst., Model Penal Code, § 224.1 (Proposed Official Draft, 1962). The specific reference to notes issued "by or on behalf of the United States," in G. L. c. 267, § 29 (fn. 5), is not here relevant. Section 29 deals with advertising resembling paper money or government securities. It has no necessary relation to statutes making criminal deliberate counterfeiting. The original predecessor of § 29 (St. 1849, c. 5) was passed separately from St. 1804, c. 120.

3. There was no fatal variance between the indictments (which referred to "notes and bills" or "bank bills," issued or purportedly issued "by the Federal Reserve Bank of the United States") and the proof which showed that the case dealt with counterfeit Federal Reserve notes. See G. L. c. 277, §§ 34–35.[6] See also *Commonwealth* v. *Hall,* 97 Mass. 570, 573.

*Judgments affirmed.*

---

[6] At the arguments, Saville's attorney disclaimed any contention that the field of counterfeiting had been preëmpted by Congress. See 18 U. S. C. § 3231 (1964), which provides, in part, that nothing "in this title shall be held to . . . impair the jurisdiction of the courts of the several States under the laws thereof." See also *Fox* v. *Ohio,* 5 How. 410, 434–435, and *State* v. *Scarano,* 149 Conn. 34, 39–41, where the authorities are collected; Perkins, Criminal Law, p. 307, et seq.