COMMONWEALTH vs. MICHAEL DAVID MURPHY.

No. 06-P-1811.

Bristol. October 4, 2007. - November 30, 2007.

Present: KANTROWITZ, BROWN, & GREEN, JJ.

*Tendering a False Note. Intent.*

At the jury-waived trial of criminal complaints charging the defendant with
uttering a counterfeit note pursuant to G. L. c. 267, § 10, the evidence was
sufficient to permit the judge, drawing reasonable inferences from evidence
of the defendant's actions, to conclude that the Commonwealth had proved
beyond a reasonable doubt the defendant's knowledge of the counterfeit
status of several twenty-dollar bills he tendered at two bars and his intent
to defraud. [776-779]

COMPLAINTS received and sworn to in the Taunton Division of
the District Court Department on March 14, 2006.

The cases were heard by *Kevan J. Cunningham*, J.

*Brad P. Bennion* for the defendant.

*Shoshana E. Stern*, Assistant District Attorney, for the
Commonwealth.

KANTROWITZ, J. Michael David Murphy was convicted, after a
jury-waived trial, of two counts of uttering a counterfeit note
pursuant to G. L. c. 267, § 10.[1] On appeal, he argues that
(1) the Commonwealth failed to prove beyond a reasonable
doubt that he knew the bills were counterfeit and had the intent
to defraud; and (2) the uttering of counterfeit Federal Reserve
notes is not criminalized under G. L. c. 267, § 10. We affirm.

*Facts.* At approximately 11:30 P.M., on February 28, 2006,
the defendant entered Pub 76 in Taunton. He remained there
for about an hour, during which he purchased several shots of
alcohol and beers for himself, as well as drinks for other patrons
at the bar.

---

[1] A third count was dismissed upon the Commonwealth's motion.

Two witnesses, the bartender, Sheila Charbonneau, and a patron, Roland Hill, testified that the defendant paid for each round of drinks (between three and four rounds) with a twenty dollar bill. They further testified that each time the defendant made payment, Charbonneau gave him paper currency in change. Hill, who accepted the defendant's offer to purchase drinks, further testified that the defendant paid for the drinks each time by pulling a twenty dollar bill out of one pocket and depositing the change into another pocket.

The defendant also asked to purchase food, but the kitchen was closed by the time he arrived. Specifically, he stated that he wanted to order a "big steak."

The defendant left Pub 76 at approximately 12:45 A.M., after last call. After closing for the night, Charbonneau exchanged her tip money for what turned out to be two counterfeit twenty dollar bills from the register.

Shortly after leaving Pub 76, the defendant arrived at a second bar, Lounge 44, which is also located in Taunton. The defendant asked the bartender, Brenda King, to "set up the bar," but she refused to do so because she had already called last call. The defendant then asked for a shot of "Jack," paying for the drink with a twenty dollar bill. King testified that the twenty dollar bill did not look normal, specifically stating that "it looked like the funny papers, and on the bottom of it, it was jaggered, it wasn't even straight," and that it was "a variety of colors, it was like a pinkish with a purple and a blue." Having had previous training in detecting counterfeit notes from prior employment, she marked the bill with a counterfeit detector pen[2] and determined that the bill was, in fact counterfeit.

King returned the bill to the defendant, informing him that she could not accept it because it was counterfeit. King testified that "he told me that he had more if I needed one, and I said I can't accept that. That's when I told him if you want a shot of Jack, you have to give me a regular $5 bill."[3] The defendant then produced six dollars, a five dollar bill and a one dollar bill,

[2]King testified, "I took the marker and I marked it, and the mark stood black, so I knew it wasn't any good."

[3]The parties dispute whether the defendant was referring to "more" counterfeit bills or "more" genuine bills. The Commonwealth argues that the

both of which were legitimate. He told King that he had received the counterfeit bill from Pub 76.

After the defendant finished his drink and left Lounge 44, King called her boss's son to explain what had happened. The son called his father, the owner of the bar, who told his son to check the security videotape and produce both stills and a videotape record. The next morning the owner of Lounge 44 called Pub 76 and spoke with someone, informing him or her of what had transpired.[4] Charbonneau subsequently received a call from her manager advising her to check her tip money for counterfeit bills. Charbonneau found two counterfeit twenty dollar bills and returned them to her employer. These two bills, which the defendant was charged with uttering, had the same serial number.

The defendant was subsequently arrested. At trial, the Commonwealth and defense stipulated to the fact that when the defendant was arrested, "he had no counterfeit money on him or what appeared to be counterfeit money [and] that there was no computer, no printer, and no other money in his room."

At the close of the Commonwealth's case as well as at the close of all of the evidence,[5] the defendant filed motions for a required finding of not guilty, both of which were denied. He was convicted and now appeals.

*Sufficiency of the evidence.* In reviewing a denial of a motion for a required finding, we must determine "whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the [factfinder] 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' " *Commonwealth* v. *Pope*, 406 Mass. 581, 584 (1990), quoting from *Commonwealth* v. *Clary*, 388 Mass. 583, 588 (1983).

General Laws c. 267, § 10, as amended by St. 1974, c. 369,

---

statement demonstrates that the defendant knew the bills were counterfeit, while the defendant claims that he was referring to lawful tender. The disparate views are of no significance to our decision.

[4]The record does not indicate with whom the owner of Lounge 44 spoke at Pub 76.

[5]The defendant offered no evidence other than the stipulation.

§ 3, punishes persons who utter certain counterfeit bills and notes "knowing the same to be false, altered, forged or counterfeit, with intent to injure or defraud." The defendant argues that the Commonwealth failed to prove beyond a reasonable doubt that the defendant had the requisite knowledge of the money's counterfeit status or intent to defraud to warrant a conviction under the statute. The Commonwealth argues that reasonable inferences concerning the defendant's knowledge and intent may be drawn from his actions.

"Circumstantial evidence is competent to establish guilt beyond a reasonable doubt." *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Ibid.*, quoting from *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977).

"A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial." *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). See *Commonwealth* v. *Sabetti*, 411 Mass. 770, 779-780 (1992); *Commonwealth* v. *O'Connell*, 438 Mass. 658, 664 (2003) ("proof of intent to injure or defraud may be inferred from the circumstances").

Here, the conduct of the defendant allowed for a reasonable inference that he had knowledge of the bills' counterfeit status when he presented them at Pub 76. First, as the trial judge noted, the defendant was intent on spending his money. He bought multiple rounds of alcohol for himself, offered to buy drinks for all the patrons in Pub 76, and stated that he wanted a "big steak."

Second, the defendant repeatedly paid for drinks at Pub 76 and Lounge 44 with twenty dollar bills, despite having smaller, genuine bills in his possession. Charbonneau, the bartender at Pub 76, testified that the defendant paid for drinks with a twenty dollar bill at least four times, and that she gave him change each time. Hill, a patron in the bar, corroborated this testimony, stating, "I believe he ended up ordering like three or four times." This conduct leads to an inference that the defendant was trying to unload his counterfeit bills as quickly as possible, exchang-

ing them for genuine currency of smaller denominations. See *United States* v. *Rice*, 652 F.2d 521, 526 (5th Cir. 1981) ("Among those acts from which guilty knowledge may be inferred is the use of larger counterfeit bills for small purchases rather than genuine change in the possession of the perpetrator").[6]

Third, the defendant segregated the genuine bills he received as change from the counterfeit twenty dollar bills already in his possession. Hill testified that the defendant pulled twenty dollar bills out of one pocket and deposited the smaller bills he received in change into another pocket. This conduct indicated that the defendant was tracking the bills that he had not yet converted to genuine money. See *United States* v. *Perez*, 698 F.2d 1168, 1171 (11th Cir. 1983) ("the most important 'surrounding circumstance' indicative of [defendant's] guilty knowledge was his segregation of counterfeit bills from genuine bills").

Lastly, the factfinder could conclude that the defendant lied to King, the bartender at Lounge 44, when he stated that he received the counterfeit twenty dollar bill from Pub 76. This statement was false because, as the evidence showed, the only change the defendant received from Pub 76 were smaller denomination bills. See *United States* v. *Pitts*, 508 F.2d 1237, 1240 (8th Cir. 1974), cert. denied, 421 U.S. 976 (1975) ("false exculpatory statement . . . could have been seen by the jury as a guilty man's desperate attempt to avoid arrest").

The evidence provides a reasonable inference that the defendant was attempting to exchange quickly the counterfeit bills for genuine ones. A trier of fact could conclude that the

---

[6]Prosecution under G. L. c. 267, § 10, is rare and has not given rise to much case law defining the sorts of evidence needed to sufficiently prove knowledge and intent. Claims are ordinarily brought under the Federal uttering statute, 18 U.S.C. § 472 (1994). *Commonwealth* v. *Saville*, 353 Mass. 458, 464 n.5 (1968). While the Federal statute does not include the phrase "knowing the same to be false," Federal courts have held "that the phrase 'with intent to defraud' includes a charge of knowledge on the part of the defendant that the notes were counterfeit." *United States* v. *Meisch*, 370 F.2d 768, 771 (3d Cir. 1966). See *United States* v. *Finnerty*, 470 F.2d 78, 80 (3d Cir. 1972). The Federal uttering statute is, thus, generally similar to G. L. c. 267, § 10, and its case law is, therefore, persuasive on the kind of proof needed under G. L. c. 267, § 10. See *Howard* v. *Burlington*, 399 Mass. 585, 589 (1987) ("In construing Massachusetts statutes we are ordinarily guided by the construction given the parallel Federal statute by the Federal courts").

defendant's knowledge and intent to defraud were proved beyond a reasonable doubt.[7]

*Judgments affirmed.*

---

[7]The defendant argues that G. L. c. 267, § 10, criminalizes uttering commercial paper notes or bank bills, which are promises to pay money, not counterfeit Federal Reserve notes, which are money. First, as the issue was not raised below, we need not consider it here. *Commonwealth* v. *Marchionda*, 385 Mass. 238, 242 (1982) ("An issue not fairly raised before the trial judge will not be considered for the first time on appeal"). Even if we were to consider it, the defendant would fare no better. Despite the creativity of his argument, which included a historical overview of our nation's currency, it must nonetheless fail, if for no other reason than that bills printed in the United States identify themselves as Federal Reserve *notes*, thus fitting snugly within the parameters of the statute, which provides that "[w]hoever utters or passes or tenders in payment as true any such false, altered, forged or counterfeit note . . . shall be punished." Moreover, the defendant's contention that the statute applies only to promises to pay money, and not to money itself, is disposed of by *Commonwealth* v. *Saville*, 353 Mass. at 463-464. The fact that the form of Federal Reserve notes has changed since the date of the *Saville* opinion does not matter, as the court's analysis did not turn on the particular form of Federal Reserve notes issued at that time.