Argued and submitted November 1, 1994, reversed and remanded for new trial
January 25, 1995

# STATE OF OREGON,
*Respondent,*

*v.*

# DANIEL EDWARD CARTER,
*Appellant.*

## (920143CR; CA A82163)

889 P2d 354

B. Gil Sharp argued the cause for appellant. With him on the brief was Jaques, Sharp & Sherrerd.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendant was convicted of manufacturing marijuana, possession of more than one ounce of marijuana and misdemeanor delivery of marijuana and possession of hashish. ORS 475.992. The jury specifically found that defendant's conduct constituted a commercial drug offense under ORS 475.996(1)(b). As a result, his history risk score for purposes of sentencing was enhanced, and he was sentenced accordingly. Defendant appeals the convictions and the enhanced sentence. We reverse.

First, defendant assigns error to the trial court's failure to grant his motion to suppress evidence seized from his residence pursuant to a search warrant. He argues that the information in the affidavit that was the basis for the search warrant was insufficient to issue the warrant. We review the affidavit "to determine if the issuing magistrate could reasonably have drawn inferences from the data in the affidavit to find probable cause to issue a search warrant." *State v. Bice*, 115 Or App 482, 485, 839 P2d 244 (1992).

The indictment alleges that defendant manufactured marijuana between May 1, 1992, and July 16, 1992. His residence was searched on July 16, 1992. The affidavit in support of the search warrant, dated July 15, 1992, contains information from six unnamed informants, four of whom the trial court relied on in denying defendant's motion to suppress. Because the state does not ask us to consider the information from the other two informants in reviewing the sufficiency of the affidavit, we focus on the information given by informants #2, #3, #4, and #6. According to the affidavit, informant #2 "observed" defendant in possession of "a wallet full of $100.00 bills" approximately 12 months before July, 1992. Informant #3 had last seen defendant about that same time and had smelled marijuana on defendant "at various times." Informant #4 gave the affiant information regarding Robert Blouin and defendant. Informant #4 told the affiant:

> "Rick (Robert) Blouin does not work, but appears to have plenty of money. * * * [Informant #4] states that a vehicle will arrive at the Blouin residence, stay a short period of time and then will make numerous short term trips. [Informant #4] states that Blouin and associates will take items from

their vehicles and expedite the items in a furtive manner into the residence. [Informant #4] has observed Blouin removing panels from the interior of Blouin's Blue Honda and then putting them back in. * * * Your affiant was told by [the informant] that Oregon License #QJZ504 registered to Daniel E. Carter * * * [has] been observed at [the Blouin residence] on more than one occasion."

Informant #6 told the affiant that he had observed a "grow room" in the basement of defendant's home "in early 1991," and gave the following description of that room:

"[T]he grow operation is located in the basement area of the residence which is divided up into four (4) rooms, a grow room, a starter room, a trim room, and a storage room. The main grow room contains plants, a carbon monoxide burner, and a turret light system with Halide and Sodium Lights. The starter room has a hydroponic watering system, and is located on the south wall of the basement between the main grow room and the trim room."

The affiant also provided information to the court regarding defendant's monthly electrical usage. From December 21, 1990, to June 23, 1992, defendant's average monthly usage was 2,850.5 kilowatt hours (KWH). The affiant further stated:

"[T]he Hood River County Assessors Office residential appraisal records reflect that the property consists of a single family wood structure with an unattached garage. The residence is a [sic] described as being a one story structure containing 1300 square feet with an unfinished full basement. Additionally, the appraisal records list a wood stove as the only type of heat.

"Your affiant obtained a power usage brochure from Pacific Power & Light which approximates average monthly kilowatt usage, which is based on a 1500 square foot home. The brochure points out that homes differ in usage according to size, climate, construction, insulation and family living habits. Your affiant calculated from the aforesaid brochure that a 1500 square foot home with five family members could consume approximately 2,963 kilowatt hours of electricity monthly with a daily average use of 98.7 kilowatt hours, if the home is all electric, equipped with a heat pump, and figuring in all the convenient appliances, i.e. waste disposal, toaster, iron, radio, microwave, fry pan, clothes washer, coffee maker, electric blanket, dishwasher, T.V., clothes

dryer, range, lights, water bed heater, and one refrigerator with freezer.

"Based upon the Pacific Power & Light electrical usage brochure and the Hood River County Residential Appraisal records, the electrical power usage [at defendant's residence] has an abundant amount of unexplained electrical power usage. Your affiant knows that 1000 Watt lights are commonly used in indoor marijuana grow operations which consume approximately 360 KWH's monthly or 12 KWH's daily. Additionally, your affiant knows that electrical usage normally fluctuates from winter to summer with an all electrical dwelling. The electrical usage at [defendant's residence] remains somewhat constant from season to season averaging 93.68 Kilowatt Hours Daily. This type of constant high electrical usage is consistent with high intensity lights used in indoor marijuana grow operations, considering that the dwelling is heated by wood, gas, oil or other sources of fuel, other than electricity."

In addition to this information, the affiant stated that defendant had been arrested for possession of marijuana in 1989, that officers had been to defendant's home in July, 1992, and observed that the windows were open, the drapes closed, and that the garage had a window through which the interior could not be observed. Finally, the affidavit says that

"the common marijuana grow cycles are between 60 and 120 days and people will commonly grow marijuana in various growing stages, allowing the people to continuously harvest and sell marijuana."

From all of the information, the affiant concluded that there was an "ongoing criminal enterprise" to manufacture marijuana at defendant's residence.

Defendant first argues that certain information must be excised from the affidavit, because the informants did not have a personal basis for their information. ORS 133.545(4) provides, in part:

"If an affidavit is based in whole or in part on hearsay, the affiant shall set forth facts bearing on any unnamed informant's reliability and shall disclose, as far as possible, the means by which the information was obtained."

In *State v. Wilson/Helms*, 83 Or App 616, 733 P2d 54 (1987), we said:

"Oregon has incorporated the 'two-part test' of *Aguilar/ Spinelli [Aguilar v. Texas*, 378 US 108, 84 S Ct 1509, 12 L Ed 2d 723 (1964); *Spinelli v. United States*, 393 US 410, 89 S Ct 584, 21 L Ed 2d 637 (1969),] into the statutory law of search warrants. ORS 133.545. Under that test, an affiant relying on information from an unnamed informant must inform the magistrate of (1) the underlying circumstances from which the informant gathered his information and/or formed his conclusions ('the "basis-of-knowledge" prong') and (2) the underlying circumstances from which the officer concluded that the informant was credible or that his information was reliable ('the "veracity" prong')." 83 Or App at 621. (Citations omitted.)

An unnamed informant's information may meet the "basis of knowledge" prong, if the informant explains how he or she obtained the information. Otherwise, "the information could be the product of rumor or an unverified statement from a third person." *State v. Urbach*, 83 Or App 39, 42, 730 P2d 571 (1986). As to informants #2, #3 and #6, the affidavit shows that their basis of knowledge came from personal observations. Informant #4's statements do not meet that requirement, except for the statement about Blouin's removal of car panels. Therefore, we excise from the affidavit all of the information derived from informant #4 except that statement.

Next, defendant argues that, when the information in the affidavit is considered as a whole, it does not give rise to probable cause to believe that a search of defendant's residence in July, 1992, would result in finding evidence of illegal activity. The trial court ruled:

"In analyzing the facts and information set forth in the Affidavit which the Court may consider, the Court is impressed by the fact that in the early part of 1991, when a marijuana grow operation was observed at the defendant's residence at 6780 Old Parkdale Road, Mt. Hood, Oregon, the power usage was running anywhere from 92.72 kilowatt hours per day on average through May to a low of 72.1 kilowatt hours per day average usage. Considering the approximate same time frame of the last five months prior to the issuance of the search warrant, the usage was a high of 109.31 kilowatt hours per day to a low of 87.18 kilowatt hours average per day usage. The reasonable inference that

the Court can draw is that the power consumption had increased substantially at or about the time the application was being made for the Search Warrant as compared to the time when the marijuana grow operation was observed in early 1991. Combining that fact with the lack of substantial deviation in the power consumption throughout the year, other than the gradual increase from the early part of 1991 to the middle of 1992, and the other factors of smelling marijuana on the defendant's person in July of 1991 and the covering of the window opening, as well as the open windows in July of 1992, allows the Court to draw the inference that marijuana was growing in the defendant's residence and that there is still a growing operation going on in the defendant's residence and that a reasonable person would conclude that a search of the residence would result in the finding of marijuana."

The trial court compared the monthly power usage in defendant's 1,300-square-foot home to the monthly average in a 1,500-square-foot "all electric" home with five people living in it, and concluded that defendant's power consumption was high. However, defendant's average power consumption was approximately 100 KWH less per month than the average power consumption in an all-electric 1,500-square-foot home. We have no way of discerning from the affidavit how much less electricity a 1,300-square-foot wood-heated home would consume. The affidavit also states that the consumption was consistent in defendant's home all year round, which is unusual in an all-electric home, and that a reasonable explanation for the unusual consistency in power consumption is that defendant was maintaining a grow operation. Once again, the suggested explanation is unsupported by the factual predicate, because defendant's home does not have electric heat. Moreover, the assertion about consistent consumption is unsupported by the record of consumption, because usage fluctuated greatly depending on the time period involved.[1] As an example, the power consumed from

---

[1]

| PERIOD | DAYS | KWH's | DAILY AVERAGE |
|---|---|---|---|
| 12/21/90 - 1/23/91 | 33 | 3060 | 92.72 |
| 1/23/91 - 2/22/91 | 30 | 2480 | 82.66 |
| 2/22/91 - 3/22/91 | 28 | 2170 | 77.50 |
| 3/22/91 - 4/23/91 | 32 | 2310 | 72.18 |
| 4/23/91 - 5/23/91 | 30 | 2460 | 82.00 |
| 5/23/91 - 6/24/91 | 32 | 2900 | 90.62 |
| 6/24/91 - 7/23/91 | 29 | 2620 | 90.34 |

February 22, 1991, to March 22, 1991, was 2,170 KWH, while the power used from October 23, 1991, to November 22, 1991, was 3,470 KWH. Moreover, the fact that defendant had his windows opened and drapes closed in July, 1992, or that a window in his garage was obscured does not lead to an inference that marijuana was growing inside defendant's home.

Finally, the trial court was persuaded that probable cause existed for the issuance of the warrant because it concluded that the electrical usage record demonstrates that "marijuana was growing in the defendant's residence and that there is still a growing operation going on [there]." Informant #6 told the affiant that he had observed a "grow room" at defendant's residence in early 1991. In the room was a turret light system with halide and sodium lights. According to the affiant, 1,000-watt lights are commonly used in grow operations which consume approximately 12 KWH's per day. Also, he said that marijuana is grown in 60- to 120-day cycles. With those facts in hand, we compare the electrical usage just before the issuance of the warrant with the early months of 1991 to determine if the electrical record demonstrates an operation existing in July, 1992.

When the early 1991 usages are used as a standard for when the lights purportedly are in use, there is no inference that the lights were in use just before July, 1992. For the first four months of 1991, the usage *decreased* and, when compared with the usage in October, 1991; December, 1991; January, 1992; March, 1992; and April, 1992, it is considerably less. Although there are several 60-day periods of elevated usage, none of those periods occurred in early 1991, and the last such period ended on May 22, 1992, or approximately 55

| | | | |
|---|---|---|---|
| 7/23/91 - 8/23/91 | 31 | 2760 | 89.03 |
| 8/23/91 - 9/23/91 | 31 | 2980 | 96.12 |
| 9/23/91 - 10/23/91 | 30 | 2650 | 88.33 |
| 10/23/91 - 11/22/91 | 30 | 3470 | 115.66 |
| 11/22/91 - 12/23/91 | 31 | 2910 | 93.87 |
| 12/23/91 - 1/23/92 | 31 | 3280 | 105.80 |
| 1/23/92 - 2/24/92 | 30 | 3220 | 107.33 |
| 2/24/92 - 3/23/92 | 28 | 2790 | 99.64 |
| 3/23/92 - 4/23/92 | 31 | 3290 | 106.12 |
| 4/23/92 - 5/22/92 | 29 | 3170 | 109.31 |
| 5/22/92 - 6/23/92 | 32 | 2790 | 87.18 |

days before the warrant issued. We construe affidavits in support of the issuance of a search warrant in a common sense fashion. Although an affidavit need not exclude all other possible reasons for the existence of certain facts that would give rise to probable cause, it must at least state facts that would give rise to a reasonable inference that the purported activity is continuing at the time of the affidavit. *See State v. Wilson*, 120 Or App 382, 387, 852 P2d 910 (1993). The lower reading for May 22, 1990, through June 23, 1992, in the context of the other facts in the affidavit, does not support the argument that there was an "ongoing" manufacturing operation in July, 1992.

In *State v. Gale/Rowden*, 105 Or App 489, 496-97, 805 P2d 158 (1991), we said:

"Although probable cause to search must exist when a warrant is issued, 'that does not mean that, simply because some information in an affidavit is old, a magistrate must exclude it when deciding whether the requisite probable cause exists.' Rather, the information presented must be evaluated in its *totality*. The lapse of time after which information becomes stale depends on all the circumstances." (Emphasis in original; citations omitted.)

Except for the electrical usage information, all of the material information in the affidavit is more than one year old. We conclude that, based on the totality of the circumstances, the information in the affidavit does not give rise to probable cause that a marijuana grow operation was in existence in defendant's residence at the time the application for a search warrant was submitted. The trial court erred in denying defendant's motion to suppress.

Defendant's other assignments of error need not be addressed in light of our ruling on the motion to suppress.

Reversed and remanded for a new trial.