# IN THE SUPREME COURT OF IOWA

No. 19–1052

Submitted September 15, 2021—Filed March 18, 2022

**STATE OF IOWA,**

>  Appellee,

vs.

**PATRICK BRACY,**

>  Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Marshall County, John J. Haney, Judge.

The defendant in a criminal case seeks further review of a court of appeals decision affirming his drug-related convictions and rejecting his challenge to a search warrant. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and McDonald, JJ., joined. Appel, J., filed a dissenting opinion, in which Oxley and McDermott, JJ., joined.

Martha J. Lucey, State Appellate Defender, Shellie Knipfer, Assistant Appellate Defender, and Kerrigan L. Owens, Law Student, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Our standard for review of search warrants is deferential. We consider whether the grant of the warrant had a substantial basis under the totality of the circumstances as disclosed in the warrant application. In this case, the detective supported his warrant application with a number of items. These included the fact that four different—although unidentified—individuals had reported the defendant as currently dealing in methamphetamine, the defendant's recent drug and weapons convictions, and the defendant's monitored phone calls from jail the previous day. In one call, the defendant discussed with his father the importance of not letting anything happen to his safe which had "everything." In the other, the defendant discussed with his female companion going through "shit" to pay off his debt, and the fact that "all that shit" was in the house. The magistrate found this information sufficient to justify a search warrant for the house. We conclude that the magistrate's determination had a substantial basis.

In reaching this conclusion, we emphasize that the entire warrant application should be considered. Items should not be excised merely because, by themselves, they are not particularly significant and would not establish probable cause. In other words, excision pursuant to *Franks v. Delaware* should occur only in the situation described in *Franks v. Delaware*: when statements in the warrant application were intentionally or recklessly false. *See* 438 U.S. 158, 171–72 (1978).

For the foregoing reasons, we affirm the district court's denial of the defendant's motion to suppress, the defendant's convictions and sentence, and the decision of the court of appeals.

**II. Background Facts and Proceedings.**

**A. The Search Warrant.** In August 2018, Detective Dane Bowermaster, a detective for the Marshalltown Police Department, received an anonymous tip that alleged Patrick Bracy was dealing methamphetamine. After about two months of investigation, on September 11, Detective Bowermaster presented a sworn search warrant application to a Marshall County magistrate. The application sought to search Bracy's residence and vehicles for evidence of drug dealing. The following is a summary of the facts as presented in that application.

On May 23, Bracy was cited for driving under suspension while operating a white 2001 Mazda Tribute not registered in his name. One week later, the vehicle was re-registered to Bracy's father, Donald.

During the second week of August, a confidential criminal defendant informant told Detective Bowermaster that Bracy was "a large level meth dealer." This informant took Detective Bowermaster to the 600 block of West Linn Street and pointed out "a possible house where [Bracy] lived." The informant reported that Bracy was living with his father. Detective Bowermaster reviewed police records that confirmed Bracy's address was 614 West Linn Street. He also went to the house and saw the white Mazda in the driveway.

Bracy is thirty years old. A check of Bracy's criminal history revealed that he had accumulated three convictions in the past four years: (1) possession of a

controlled substance with intent to deliver on August 18, 2014; (2) carrying weapons on October 13, 2015; and (3) possession of a controlled substance (methamphetamine) on January 13, 2017.

During the third week of August, a second confidential criminal defendant informant met with Detective Bowermaster. The informant claimed Bracy was "a meth dealer moving anywhere from ounce to pound level quantities." This informant also stated that Bracy lived in his father's house at 614 West Linn Street.

On August 30, "[Bracy] was involved in an incident which he fled on foot from. The investigating officers found the white 2001 Mazda Tribute, . . . registered to Donald Bracy, parked outside the address where the incident occurred and believed [Bracy] drove it there."

On September 4, Bracy was arrested and jailed on an unrelated outstanding warrant. At the time of the arrest, Bracy was with Maria Vargas Cervantes in a red Ford F-150 registered to Bracy's father. Bracy stated that he was not employed.

During the second week of September, the police received two tips from concerned citizens. The first concerned citizen said that Bracy "was a meth dealer and [they] knew [Bracy] was in possession of large quantities of meth (multiple ounces) a few days before [Bracy]'s arrest on 9/4/18." The second concerned citizen reported that they "heard that [Bracy] had left pound quantities of meth behind" after his arrest.

On September 10, which was the day before the warrant application, Bracy made two phone calls from jail that were monitored by law enforcement. Detective Bowermaster recounted the phone calls in his application as follows:

> 10) On 9/10/18 at approximately 1110 hrs, I listened to a phone call from ["Pat"] Bracy at the jail to a person who I believe is Donald Bracy at 641-691-2640. During this phone call Pat said "don't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is."
>
> 11) On 9/10/18 at approximately 2130 hrs, Pat placed a call to 641-931-6560 and speaks to a female who he refers to as Maria. A check of the Marshall County Records shows that 641-931-6560 belongs to Maria Vargas-Cervantes as of September of 2018. The female tells Pat "do you know how much shit I have gone through to get your debt paid off?" Pat then says "it's like I told him, all that shit is right there from my dad[']s house."

Detective Bowermaster's application added, "I know from experience that people often refer to meth as 'shit.' "

The magistrate granted the application for a search warrant. Marshalltown police executed the search warrant that same day. Bracy's father and Cervantes were present. The father told police that his son had a safe in the house but he wasn't sure where it was and only his son had access to it. The safe turned out to be in the laundry room. It contained identification cards for Bracy, SD cards, a thumb drive, cellphones, a silver spoon digital scale with residue, psilocybin mushrooms in a plastic baggie, a pill bottle, marijuana in a clear container, a drug cutting agent, and three gallon-size baggies with methamphetamine. Elsewhere in the house and the garage police found more cellphones, more methamphetamine, more marijuana, other controlled substances, and more

drug paraphernalia. Altogether, the Marshalltown police seized over 235 grams of methamphetamine at the residence.

**B. District Court Proceedings.** On September 27, the State filed a trial information charging Bracy with various crimes. Count I alleged possession of a controlled substance with intent to deliver (methamphetamine) as a second or subsequent offense in violation of Iowa Code sections 124.401(1)(*b*)(7) (2018) and 124.411, a class "B" felony. Counts II, III, IV, and V alleged possession of a controlled substance (psilocybin, marijuana, amphetamine, and alprazolam, respectively) as a third offense in violation of section 124.401(5), all class "D" felonies. Count VI alleged failure to affix an Iowa drug tax stamp in violation of sections 453B.3 and 453B.12, a class "D" felony. Count VII alleged the prohibited act of keeping a drug house in violation of section 124.402(1)(*e*), an aggravated misdemeanor. Count VIII alleged unlawful possession of a prescription drug in violation of section 155A.21, a serious misdemeanor. Count IX sought the habitual offender sentencing enhancement under section 902.8.

On March 13, 2019, Bracy filed a motion to suppress evidence obtained from the search of his residence. In his motion, Bracy claimed that the search warrant was invalid because the application did not establish the credibility of the informants or their information, did not "establish a nexus to the place to be searched," and relied on stale information.

The district court denied the motion to suppress on April 30. The court noted in its order that Detective Bowermaster had independently corroborated information provided by the criminal defendant informants: the address of

Donald's house and the fact that Bracy lived there. Further, it noted Bracy's history of controlled substance violations, the informants' allegations of meth dealing, and Bracy's phone calls from jail. The court stated,

> The Court FINDS that this information, along with the other information provided in the warrant application, when considered together, provides sufficient information to establish the credibility of the informants or the information provided by them. Information provided by the citizen informants is presumed reliable and the information provided by the "criminal defendants" was either corroborated in part by law enforcement or Bracy's own recorded phone calls.

The court concluded, "There is a substantial basis to conclude that probable cause existed to support the warrant application."

The parties stipulated to a trial on the minutes. On May 24, the district court found Bracy guilty on counts I through VIII and applied the sentencing enhancement. Bracy was sentenced to a total of forty-two years in prison, including twenty-five years for dealing methamphetamine. *See* Iowa Code § 902.9(1)(*b*)–(*c*); *id.* § 903.1(1)(*b*), (2).

**C. Appellate Proceedings.** Bracy filed a timely notice of appeal. We transferred the case to the court of appeals.

On appeal, Bracy again contested the validity of the warrant application. The court of appeals reviewed the information disclosed in the warrant application, including the tips, Bracy's criminal history, Bracy's jailhouse calls, and the training of the officer. Based on "the totality of the information presented in the warrant application," the court of appeals found there had been a substantial basis for issuing the warrant and affirmed Bracy's convictions and sentence.

Bracy sought further review of the court of appeals decision, and we granted his application.

### III. Standard of Review.

"We review questions of a constitutional dimension de novo, based on the totality of the circumstances." *State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015) (quoting *State v. Johnson*, 756 N.W.2d 682, 686 (Iowa 2008)). "The test for probable cause is 'whether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there.'" *State v. Baker*, 925 N.W.2d 602, 613 (Iowa 2019) (quoting State v. *Gogg*, 561 N.W.2d 360, 363 (Iowa 1997)). "However, we do not make an independent determination of probable cause; rather, we determine 'whether the issuing judge had a substantial basis for concluding probable cause existed.'" *McNeal*, 867 N.W.2d at 99 (quoting *Gogg*, 561 N.W.2d at 363).

When reviewing a warrant application, "we examine only the information actually presented to the judge." *Id.* But "we do not strictly scrutinize the sufficiency of the underlying affidavit." *Id.* at 100. "[T]he affidavit of probable cause is interpreted in a common sense, rather than a hypertechnical, manner." *Gogg*, 561 N.W.2d at 363–64. "We draw all reasonable inferences to support the judge's finding of probable cause and decide close cases in favor of upholding the validity of the warrant." *Baker*, 925 N.W.2d at 614; *see also McNeal*, 867 N.W.2d at 100 ("[W]e draw all reasonable inferences to support the judge's finding of probable cause and give great deference to the judge's finding." (alteration in original) (quoting *Gogg*, 561 N.W.2d at 364)).

**IV. Analysis.**

Bracy argues that the search warrant issued by the magistrate was not supported by probable cause, and therefore, the search violated the Fourth Amendment to the U.S. Constitution and article I, section 8 of the Iowa Constitution. We disagree. When we look at the entirety of the warrant application and draw reasonable inferences in support of the warrant, there was clearly a substantial basis for finding probable cause that Bracy was dealing methamphetamine from the house.

We consider all of the information in the warrant application. The detective's application listed four separate tips from confidential informants that indicated Bracy was actively dealing methamphetamine. Two of those tips provided the nonpublic information that Bracy lived in his father's house, and the informants were familiar enough to know where the house was. Also, Bracy had two prior drug convictions, one of which was for methamphetamine possession that had occurred only twenty months ago. Bracy was unemployed and living with his father at age thirty, yet he had "a lot of money" in his safe. When Bracy spoke to his dad from jail, he was suspiciously concerned about something happening to his safe "where everything is." Later the same day, Bracy spoke with Cervantes in an apparently coded conversation about the sale of methamphetamine from his dad's house.

Perhaps, no single piece of information in the application would have sustained probable cause on its own. But that is not required. Considering the totality of the circumstances, the magistrate had a substantial basis for

concluding there was probable cause to believe illegal drugs could be found in the house.

Bracy's arguments on appeal rest on a series of faulty premises. First, and most erroneously, he contends that the four anonymous tips must be "redacted from the search warrant application" because on their own they do not establish probable cause. In so arguing, he treats appellate review of a warrant as some kind of high school biology lab exercise. He dissects the warrant, examining it bit-by-bit under a microscope and asks us to throw out any bits that, in his view, do not establish probable cause on their own. That's not right.

Under *Franks*, if the reviewing court finds that the affiant consciously falsified the challenged information, or acted with reckless disregard for the truth in their application for the warrant, the offensive material must be deleted and the remainder of the warrant reviewed to determine whether probable cause existed. 438 U.S. at 171–72. We have applied *Franks* in the past in cases involving allegations that the officer provided false information in the warrant application. *See, e.g.*, *State v. Niehaus*, 452 N.W.2d 184, 186–87 (Iowa 1990); *State v. Groff*, 323 N.W.2d 204, 208–09 (Iowa 1982).

*Franks* is a specific doctrine limited to intentionally or recklessly false statements by the officer in the warrant application. This case has nothing to do with *Franks*. There is no allegation that Detective Bowermaster provided false information to the magistrate. So there is no reason to delete or disregard anything in Detective Bowermaster's warrant application. The entire application should be considered as a whole. *See Baker*, 925 N.W.2d at 613 ("We use the

totality-of-the-circumstances standard to determine whether officers established probable cause for issuance of a search warrant."); *McNeal*, 867 N.W.2d at 105 (considering the "totality of the circumstances as presented in the application for search warrant").

Bracy tries to rely on *State v. McNeal*, a case in which we upheld a search warrant against a Fourth Amendment challenge. 867 N.W.2d at 99, 105. There, the defendant specifically complained about the affiant's reliance on two items: an anonymous tip and an old conviction. *Id.* at 100–02. We found the warrant to be proper and said, "Here, even if we excise the information contained in the anonymous tip and evidence of McNeal's prior conviction as argued by McNeal, based on the totality of the circumstances as presented in the application for search warrant, probable cause existed to support the search warrant in this case." *Id.* at 103. We also said, "[E]ven if we accept McNeal's argument that the application for search warrant contained impermissible information, a reviewing court can remove the offending information and determine whether the remaining information establishes probable cause." *Id.* at 102 (citing *Niehaus*, 452 N.W.2d at 186–87).

*McNeal* did not hold that one *must* excise from the warrant application information that is merely stale or insufficient on its own to support probable cause. That would be a novel extension of Fourth Amendment law under *Franks*. Rather, we said that even if the information hypothetically were excised, the warrant application remained sufficient. *Id. McNeal* was a Fourth Amendment case only, and we would have had no authority to divert from federal precedent.

Any suggestion in *McNeal* that merely unpersuasive information, as opposed to false information, should be excised would have been mere dicta, and inaccurate dicta at that. *See, e.g.*, *United States v. Mejía Romero*, 822 F. App'x 1, 2–3 (1st Cir. 2020) (stating that "the warrant application must be read as a whole" and criticizing the defendant's "piecemeal appraisal" and "divide-and-conquer approach"). There is no reason for us to disregard the tips from the confidential informants in this case.

But of course, this case involves far more than four unnamed informants. Bracy had prior drug and weapons convictions, including a methamphetamine conviction from the previous year. Bracy argues that the 2014 and 2015 convictions are too old and the 2017 conviction "alone" does not establish probable cause. Again, that is not the issue; we don't need to throw them out. Even an arrest can be considered as a supporting fact in a warrant application "when it tends to show a nexus between the defendant and illegal narcotics activity." *Baker*, 925 N.W.2d at 616. All three convictions provide some weight toward probable cause, particularly the most recent conviction.

The two jailhouse phone calls add substantial weight as well. On September 10, when Bracy called his father from jail, he said, "Don't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is." Later that evening, a few hours before the detective submitted the warrant application, Bracy called Cervantes, his companion at the time of his arrest the previous week. Cervantes discussed going through a quantity of "shit" to get Bracy's debt paid off, and Bracy responded that he had told "him"

(presumably Bracy's creditor) that "all that shit is right there from my dad[']s house." Detective Bowermaster, a seasoned detective assigned to the Mid-Iowa Drug Task Force, stated in the application, "I know from experience that people often refer to meth as 'shit.' "

Bracy engages in an elaborate effort to dispute the incriminating nature of the calls. We are not convinced. Bracy says, "There is nothing nefarious about keeping money within a safe." But it is curious that this unemployed person was so concerned about his safe, which contained "everything," that he phoned his father about it from jail. *See State v. Lindsey*, 881 N.W.2d 411, 425–26 (Iowa 2016) (finding that an injured football player's "unprompted concern about his bag 'raised a red flag' " for Fourth Amendment purposes).

Bracy also asks us to reject Detective Bowermaster's expert opinion that Bracy and Cervantes were using "shit" over the phone to refer to "methamphetamine." We decline to do so. Not only was this Detective Bowermaster's trained opinion, but alternative interpretations of the phone call do not add up.

Hypothetically, if "shit" means money, the exchange is hard to explain. Bracy would normally know the monetary amount of his own debt. And why would Bracy's creditor care where Bracy had been storing the money to pay off the debt?

On the other hand, if "shit" means meth, then the exchange makes sense. Cervantes was making a point to Bracy about how much meth she had been forced to peddle to pay off Bracy's debt. Bracy, in turn, was explaining to

Cervantes how he had implied to their customer that there was more meth available where that meth came from.

In sum, Bracy's approach would deny the deference we are supposed to afford warrants that have been approved by a magistrate. And that would be unfair to law enforcement. Most likely, Detective Bowermaster could have provided more details to support the warrant application if the magistrate had said he needed them. That's one reason our after-the-fact review asks only whether the grant of the warrant application had a "substantial basis." The grant of this warrant clearly did.[1]

**V. Conclusion.**

For the foregoing reasons, we affirm the court of appeals decision and Bracy's convictions and sentence.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., and Waterman and McDonald, JJ., join this opinion. Appel, J., files a dissenting opinion, in which Oxley and McDermott, JJ., join.

---

[1]It is also worth noting that many other jurisdictions, including the federal courts and the neighboring states of Illinois, Missouri, Nebraska, South Dakota, and Wisconsin, recognize a good-faith exception to the exclusionary rule. This precludes after-the-fact challenges when law enforcement, in good faith, execute a facially valid warrant that is later found to be lacking in probable cause. *See United States v. Leon*, 468 U.S. 897, 926 (1984); *State v. Robinson*, 454 S.W.3d 428, 442 (Mo. App. 2015); *State v. Short*, 964 N.W.2d 272, 313–14 (Neb. 2021); *State v. Sorensen*, 688 N.W.2d 193, 196–97 (S.D. 2004); *State v. Prado*, 960 N.W.2d 869, 882 (Wis. 2021); *see also* 725 Ill. Comp. Stat. 5/114-12(b)(1) (2022) (statutory good-faith exception); *State v. Davis*, 679 N.W.2d 651, 658–59 (Iowa 2004) (applying the Missouri good-faith exception to a Missouri search warrant).

Twenty-two years ago, in *State v. Cline*, we decided *not* to recognize a good-faith exception to the exclusionary rule under the Iowa Constitution. 617 N.W.2d 277, 288–93 (Iowa 2000) (en banc), *abrogated in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). No one is asking us to reconsider *Cline*. But the point is: the very challenge that Bracy is making to this facially valid search warrant would not even be available in the federal courts or five of our six neighboring states.

**APPEL, Justice (dissenting).**

The fighting issue in this case is whether a warrant to search a residence for evidence of drug dealing was supported by probable cause. The defendant filed a motion to suppress, claiming that the warrant was inadequately supported by anonymous affidavits, ambiguous jailhouse phone calls, and a stale history of criminal involvement. For the reasons expressed below, I would reverse and remand the case to the district court.

**I. Procedural and Factual Background.**

The application for a search warrant in this case states the facts as follows. During the months of August and September of 2018, Marshalltown police received anonymous calls from two criminal defendants alleging that Patrick Bracy was dealing methamphetamine.

During the second week of August, the first anonymous criminal defendant informer told Detective Bowermaster that Bracy was "a large level meth dealer." The first anonymous criminal defendant informer also stated that Bracy was living in the 600 block of West Linn Street and pointed out "a possible house" where Bracy lived. Police reviewed records that confirmed that Bracy listed his address as 614 West Linn Street.

During the third week of August, a second anonymous criminal defendant informer met with Detective Bowermaster. The second anonymous informer claimed Bracy was "a meth dealer moving anywhere from ounce to pound level quantities." This informer also stated that Bracy lived at 614 West Linn Street.

Unlike the first anonymous criminal defendant informer, the second one was able to identify the house on West Linn Street.

On September 4, Bracy was arrested and jailed on an outstanding unrelated warrant. At the time of the arrest, Bracy was with his girlfriend Maria Cervantes in a car registered to Bracy's father. During his arrest, Bracy stated that he was not employed.

After Bracy was jailed, police received two reports from anonymous citizen informers. The first anonymous citizen informer told police that Bracy was a methamphetamine dealer in possession of a large amount of methamphetamine a few days before Bracy's arrest on September 4. The second anonymous citizen informer "heard" that Bracy had left behind "pound quantities" of methamphetamine.

From the jail, Bracy made two phone calls that were overheard by police on September 10. In the first phone call, believed by the police to be with his father, Bracy told the listener, "[D]on't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is." In the second phone call to a number belonging to Maria Vargas Cervantes, the female declares, "[D]o you know how much shit I have gone through to get your debt paid off?" Bracy responded, "[I]t's like I told him, all that shit is right there from my dad's house." In the warrant application, Detective Bowermaster stated that "I know from experience that people often refer to meth as 'shit.'"

The warrant application presented Bracy's criminal history. According to the warrant application, Bracy was convicted of possession of a controlled

substance with intent to deliver on August 18, 2014; with a carrying weapons violation on October 13, 2015; and possession of a controlled substance (methamphetamine) on January 13, 2017.

Finally, paragraph 12 of the attachment to the warrant application contained boilerplate language regarding common activities of persons involved in the narcotics trade. None of the observations in the twenty-five subparagraphs are directly tied to Bracy. Instead, paragraph 12 presents generalized descriptions about how narcotics offenders behave. For instance, paragraph 12 suggests that narcotics offenders have cash or other valuables, that they store cash in secure locations, that they conceal cash within the residence, that they commonly maintain books and records, and that they use electronic equipment, such as computers, and automobiles in their business.

The warrant application sought to search persons and property related to Bracy. Property to be searched under the warrant included the home of Bracy's father, where Bracy lived, and all outbuildings and automobiles associated with the residence. Persons to be searched under the warrant included Bracy, his father, and Maria Vargas Cervantes—Bracy's girlfriend.

The magistrate granted the search warrant. When the police executed the search warrant, they found a safe in the house. Among other things, the safe contained the defendant's identity and social security card, three bags of methamphetamine, cell phones, a digital scale with residue, and a clear container with marijuana inside. More drugs were found in the garage, including methamphetamine and marijuana.

Bracy filed a motion to suppress. In his motion, Bracy claimed that the search warrant was invalid because the application did not establish the credibility of the informant's information. The district court denied the motion to suppress, noting that the "application and sworn testimony in support of the application establishes the credibility of the informants."

Bracy appealed. On the merits, applying federal precedents, the court of appeals recognized that the challenge to the search warrant in the appeal presented a "close case." The court of appeals found that the four anonymous criminal defendant and citizen informants provided information that was largely public information. Yet, the court of appeals found that the four informants, collectively, provided some probative information. The court of appeals cited Bracy's telephone conversations from the jailhouse, which, though ambiguous, could be interpreted as indicating methamphetamine was stored in a safe in Bracy's home. Finally, the court of appeals cited Bracy's criminal history in support of probable cause. Under the totality of the circumstances, the court of appeals found that the search warrant in the case was supported by probable cause.

**II. Review of Probable Cause.**

A challenge to the denial of a motion to suppress on federal or state constitutional grounds is reviewed de novo. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). "This review requires 'an independent evaluation of the totality of the circumstances as shown by the entire record.'" *Id.* (quoting *State v. Turner*,

630 N.W.2d 601, 606 (Iowa 2001)). While the court gives deference to the district court's factual findings, it is not bound by them. *Id.*

The review of whether there was probable cause is limited to what was "reduced to writing, which was actually presented to the [magistrate] at the time the application for warrant was made." *State v. McNeal*, 867 N.W.2d 91, 100 (Iowa 2015) (quoting *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997)). This court does not independently determine probable cause but merely decides "whether the issuing judge had a substantial basis for concluding probable cause existed." *Id.* at 100 (quoting *Gogg*, 561 N.W.2d at 363). In making that determination, the court does not interpret the affidavit of probable cause in a hypertechnical manner. *Id.*

**III. Analysis.**

**A. Overview.** This case involves the search of a residence. Under the United States Constitution, the search of a home is at the core of search and seizure protections provided by the Fourth Amendment to the United States Constitution. As a result, the fundamental concept that any governmental intrusion into an individual's home must be strictly circumscribed. *Boyd v. United States*, 116 U.S. 616, 630 (1886), *overruled in part on other grounds by Warden v. Hayden*, 387 U.S. 294, 302 (1967); *see also Payton v. New York*, 445 U.S. 573, 582–83 n.17 (1980); *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967). The same is true of the search and seizure protections provided in article I, section 8 of the Iowa Constitution. The search and seizure constitutional

provision protects the homes of the rich and poor, priests and felons, outstanding citizens and average citizens, and those who are down and out.

To achieve that end, the framers of the amendment interposed the warrant requirement between the public and the police, reflecting their conviction that the decision to enter a dwelling should not rest with the officer in the field but rather with a detached and disinterested magistrate. *McDonald v. United States*, 335 U.S. 451, 455–56 (1948). As Justice Jackson so eloquently stated, the warrant requirement was imposed to ensure that a neutral and detached magistrate makes the judgment calls necessary to protect privacy and liberty interests and not an officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13–14 (1948).

In order to obtain a warrant from a neutral and detached magistrate, the state must establish probable cause that a crime has been committed. The principle that search and seizure must be based on probable cause has historic roots. The classic statement of the background of probable cause appears in *Henry v. United States*, 361 U.S. 98 (1959). According to the Supreme Court:

> The requirement of probable cause has roots that are deep in our history. The general warrant, in which the name of the person to be arrested was left blank, and the writs of assistance, against which James Otis inveighed, both perpetuated the oppressive practice of allowing the police to arrest and search on suspicion. Police control took the place of judicial control, since no showing of "probable cause" before a magistrate was required. The Virginia Declaration of Rights, adopted June 12, 1776, rebelled against that practice . . . .
>
> . . . .
>
> That philosophy later was reflected in the Fourth Amendment. And as the early American decisions both before and immediately

after its adoption show, common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest. And that principle has survived to this day.

*Id.* at 100–01 (footnotes omitted).

And the *Henry* principles apply to searches as well as seizures. The probable cause requirement described in *Henry* is "the quintessential 'precondition to the valid exercise of executive power.' " *United States v. Grubbs*, 547 U.S. 90, 98 (2006).

In order to show probable cause under the Fourth Amendment to the United States Constitution, the state is not required to show certainty that evidence of criminal activity will be uncovered. Instead, the state must show a "fair probability" that evidence of criminal activity would be uncovered through a search of the locations identified in the warrant application. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate considering a warrant application "is simply [required] to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Id.* A reviewing court is to ensure that a "magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (alteration and omission in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled in part on other grounds by United States v. Salvucci*, 448 U.S. 83, 85 (1980)). Because of the preference for warrants, doubts are resolved in favor of the magistrate. *State v. Bishop,* 387 N.W.2d 554, 558 (Iowa 1986).

In this case, Bracy challenges the validity of the warrant under both the Fourth Amendment and article I, section 8 of the Iowa Constitution. Bracy does not, however, suggest that the substantive standards to be applied in this case under the Iowa Constitution are different from those articulated by the United States Supreme Court under the Fourth Amendment.[2] As a result, under our precedent, we apply the prevailing federal standards, but we reserve the right to apply those standards in a fashion that differs from federal caselaw for the purposes of this case. *State v. Ingram*, 914 N.W.2d 794, 800 (Iowa 2018); *Pals*, 805 N.W.2d at 771; *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

**B. Anonymous Informants.** Since the development of Fourth Amendment caselaw at the turn of the last century, the United States Supreme Court has ebbed and flowed in its quest to find the proper metric for determining whether probable cause exists to support a search warrant. A critical issue has been the proper treatment of information from anonymous informants offered to support an application for a search warrant.

---

[2]Specifically, Bracy does not challenge the approach to anonymous informants outlined by the United States Supreme Court in *Illinois v. Gates*. *See, e.g.*, *State v. Jones*, 706 P.2d 317, 322 (Alaska 1985) (refusing to adopt the *Gates* totality-of-the-circumstances approach on state constitutional grounds); *Commonwealth v. Lyons*, 564 N.E.2d 390, 391 (Mass. 1990) (declining to follow the *Gates* totality-of-the-circumstances standard, noting that the standard is "flexible, but is also 'unacceptably shapeless and permissive'" (quoting *Commonwealth v. Upton*, 458 N.E.2d 717, 724 (Mass. 1983))); *State v. Cordova*, 784 P.2d 30, 31 (N.M. 1989) (rejecting the federal totality-of-the-circumstances approach under *Gates*, noting that the *Aguilar-Spinelli* two-prong test comports with the New Mexico constitutional requirements); *People v. Griminger*, 524 N.E.2d 409, 410 (N.Y. 1988) (holding that as a matter of law, *Aguilar-Spinelli* should apply, not *Gates*); *State v. Jackson*, 688 P.2d 136, 143 (Wash. 1984) (en banc) (finding that the *Gates* totality-of the-circumstances approach lacks sufficient specificity and analytical structure to pass the state constitutional muster).

The Warren Court, following then-existing federal precedent, held that in order for anonymous informants to be considered in determining the presence of probable cause, the state was required to show (1) the veracity or reliability of the informant, and (2) the basis of the informant's knowledge. *See Aguilar v. Texas*, 378 U.S. 108, 114 (1964); *Spinelli v. United States*, 393 U.S. 410, 417 (1969). This formulation was known as the "*Aguilar-Spinelli* test."

About twenty years later, the Supreme Court revisited the *Aguilar-Spinelli* test in *Gates*, 462 U.S. 213. The Court recognized that the elements in the *Aguilar-Spinelli* test were "highly relevant" in determining the value of anonymous informant reports. *Id.* at 230. But the Court emphasized that the *Aguilar-Spinelli* elements should not "be understood as entirely separate and independent requirements to be rigidly applied in every case." *Id.* For example, the Court observed that a strong showing of one of the *Aguilar-Spinelli* elements might compensate for a deficiency in the other. *Id.* at 233. Abandoning the *Aguilar-Spinelli* test, the Court now held that a warrant application should be evaluated under a broader "totality of the circumstances" test. *Id.* at 238. The totality of the circumstances announced in *Gates* requires an analysis of both of the highly relevant prongs of the *Aguilar-Spinelli* test as well as any other relevant circumstances. *Id.* In making the probable cause determination, the *Gates* Court instructed that a magistrate "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists. *Id.*

But *Gates* emphasized that naked conclusory statements from an anonymous informant that criminal activity was afoot were insufficient to support probable cause. *Id.* at 239. Wholly conclusory statements that a person is committing a crime "will not do." *Id.* at 239. Similarly, a mere conclusory statement that an informant is reliable is inadequate. *Id.*

With this background, I now turn to consider the highly relevant veracity or credibility factor in evaluating the information provided by the four anonymous informants in this case. In considering veracity or credibility, we are guided by *State v. Weir*, 414 N.W.2d 327, 332 (Iowa 1987) (en banc). In *Weir*, we stated that in assessing the veracity or credibility of an informant, we should consider a number of factors, including

> [(1)] whether the informant was named; [(2)] the specificity of facts detailed by the informant; [(3)] whether the information furnished was against the informant's penal interest; [(4)] whether the information was corroborated; [(5)] whether the information was not public knowledge; [(6)] whether the informant was trusted by the accused; and [(7)] whether the informant directly witnessed the crime or fruits of it in the possession of the accused.

*Id.* (citations omitted).

I think it is clear that the conclusory statements attributed to the anonymous informers in this case provide no showing of credibility or reliability under the *Weir* framework. The informants in the warrant application were not named, did not offer specific facts other than the location of Bracy's residence, gave no indication that the statements were against penal interest, did not indicate the informants were trusted by the accused, and provided no basis that the informant directly observed criminal activity. The fact that some of the

informants knew where Bracy resided is of little value as there is no suggestion that Bracy sought to keep this information secret. His residence is the kind of information members of the public could easily possess. There was no detailed information that might be corroborated by later events.

And, finally, the credibility of informants is sometimes established through a "track record approach" demonstrating that the informant has provided reliable information in the past. *Weir*, 414 N.W.2d at 331–32 (noting that the informant, like any citizen informer, needed to show a history of reliability to prove credibility); *see also Thompson v. State*, 298 A.2d 458, 461 (Md. Ct. Spec. App. 1973) (holding that the street informant failed the "veracity" prong because no information was provided as to whether the street informant had passed on information before and turned out to be correct); *State v. Lair*, 630 P.2d 427, 430 (Wash. 1981) (en banc) (pointing out that the more frequent way to show credibility is by showing that the informant has previously supplied accurate and helpful information). In this case, all four informants were anonymous and the warrant application did not include any information regarding the track record of any of the four informants.

In sum, on the highly relevant credibility or reliability factor, the State has no case even under the expanded *Weir* factors.[3]

---

[3]The State, in the warrant application in this case, did not even provide conclusory claims that the anonymous informants were credible. In any event, conclusory claims of credibility are insufficient. *See, e.g., United States v. Dismuke*, 593 F.3d 582, 587 (7th Cir. 2010) (holding conclusory assertions of reliability entitled to no weight), *abrogated on other grounds as recognized in United States v. Miller*, 721 F.3d 435, 438–39 (7th Cir. 2013); *State v. Edmonson*, 598 N.W.2d 450, 477 (Neb. 1999) (same); *State v. Zutic*, 713 A.2d 1043, 1048 (N.J. 1998) (same). Ordinarily, reliability or credibility is shown by a track record in the past of providing truthful

A recent Iowa case involving a traffic stop supports our conclusion regarding the lack of credibility behind the anonymous tipsters in this case. In *State v. Kooima,* we considered whether the police had reasonable suspicion to stop a motorist based on an anonymous tip that the motorist was intoxicated. 833 N.W.2d 202, 203 (Iowa 2013). In *Kooima,* the tipster did not relay contemporaneous observations and provided only general known predictive information. *Id.* at 211. We held:

> [A] bare assertion by an anonymous tipster, without relaying to the police a personal observation of erratic driving, other facts to establish the driver is intoxicated, or details not available to the general public as to the defendant's future actions does not have the requisite indicia of reliability to justify an investigatory stop.

*Id.* at 210–11. The same principles are at work here.

Turning now to the highly relevant knowledge factor, the State also makes no showing of how the anonymous informants obtained their knowledge that criminal activity was afoot. There is nothing in the warrant application that demonstrates the basis of any of the anonymous informants' knowledge of Bracy's criminal activity. Mere identification of Bracy's residence does not provide a basis for a magistrate to conclude that the informants had knowledge of criminal activity. We all live somewhere. It would be preposterous to suggest that because an anonymous informant knew where a person lived, that would be sufficient to show knowledge that criminal activity was occurring in the residence. The anonymous informants do not state, for instance, that they had

---

information that has led to convictions. *See* 2 Wayne R. LaFave et al., *Search and Seizure: A Treatise on the Fourth Amendment* § 3.3(b) (6th ed. 2020).

purchased drugs from Bracy at the residence or had actually witnessed any criminal activity. There is no prediction about a course of conduct that was about to happen and could be corroborated by subsequent events. How did the informants know of the alleged illegal activity by Bracy?

A magistrate with the power to unleash the awesome power of the state through a search warrant needs an answer to this question. But there is literally nothing in the warrant application that does so. A magistrate examining the four corners of the warrant application would not be able to determine whether the conclusory information of criminal conduct was sourced in bar talk, rumor, a tweet, or an oddball website. *See United States v. Gifford*, 727 F.3d 92, 100 (1st Cir. 2013) (pointing out that with no basis of knowledge, informants' information could be based on rumor). In the *Gates* vernacular, the conclusory statements from the four anonymous informants on the highly relevant knowledge issue "will not do."[4]

One of the innovations of *Gates* was a recognition of the hydraulic relationship between the veracity and knowledge of the crime factors. The *Gates* Court embraced the notion that a very strong showing of either veracity or knowledge of the crime could compensate for a weakness on the other. *Gates*,

---

[4]*See, e.g.*, *United States v. Ramírez-Rivera*, 800 F.3d 1, 28 (1st Cir. 2015) (stating no probable cause where "no indication . . . that the police explored the Informant's basis of knowledge"), *abrogated on other grounds as recognized in United States v. Leoner-Aguirre*, 939 F.3d 310, 314–15 (1st Cir. 2019); *United States v. Morales*, 171 F.3d 978, 982 (5th Cir. 1999) (per curiam) (finding no probable cause where callers "did not indicate how they knew the information"); *Valentine v. State*, 207 A.3d 566, 573–74 (Del. 2019) (finding no probable cause when affidavit does not disclose how information obtained); *State v. Walker*, 62 A.3d 897, 903 (N.J. 2013) (finding no probable cause because no indication of basis of knowledge); *State v. Chaplin*, 44 A.3d 153, 158 (Vt. 2012) (noting that nothing details source of knowledge, therefore no probable cause).

462 U.S. at 233. Here, however, there is no substantial support for either factor in the information from the anonymous informants. Everything is at flat zero, the strength of the credibility factor, the strength of the knowledge factor, and the difference in strength between them.

Another of the innovations of *Gates* was the approval of the principle that sometimes a prediction of future detailed events that subsequently come to pass provides sufficient corroboration to support a probable cause determination where credibility and knowledge factors might be weak. The seminal corroboration case involving an otherwise borderline application for a search warrant is *Alabama v. White*, 496 U.S. 325 (1990). In *White*, an anonymous informant predicted that a suspect would leave the apartment at a specified time, get into a car specifically described, and drive to a named motel. *Id.* at 327. When these predictive events came to pass, the *White* Court concluded that the accurate prediction of future events gave rise to a degree of imputed reliability to other information provided by the informant. *Id.* at 331–32; *see also Draper v. United States*, 358 U.S. 307, 312–13 (1959) (stating detailed description of suspect's physical attributes, clothing, handbag, and predicted train and location sufficient to establish probable cause after the details were corroborated by police).

But the prediction of future conduct is nowhere to be found in this case. While police did in a sense "corroborate" where the anonymous informants claimed Bracy lived, there is nothing in the warrant application to suggest that Bracy was hiding in any way at his father's home. Where he lived was an

innocent and public fact. As noted by one federal district court, "Upon such anemic evidence[—identification of where the defendant lived—]agents may not rush headlong for a warrant . . . , and thus trigger the awesome machinery of legal process against an individual." *United States v. Brennan*, 251 F. Supp. 99, 105 (N.D. Ohio 1966). There is ample support for the notion that where an anonymous tipster provides police with only the location of the residence of the individual, a location confirmed by police, there is no support for a search warrant based on the confirmation of innocent facts.[5]

Finally, the Supreme Court has also suggested that a statement against penal interest might give rise to a degree of credibility or reliability of anonymous informer statements. *United States v. Harris*, 403 U.S. 573, 583–84 (1971). But there is nothing in the warrant application to indicate that the anonymous informants were making such statements.

The State cites two cases in support of its position regarding the anonymous informers, *State v. McNeal*, 867 N.W.2d 91, and *State v. Post*, 286

---

[5]*See, e.g.*, *United States v. Tuter*, 240 F.3d 1292, 1297 (10th Cir. 2001) (noting where anonymous informant does not provide predictive details and agent only corroborated innocent, innocuous details about defendant's appearance, residence, cars, and child, no facts supporting probable cause); *United States v. Wells*, 223 F.3d 835, 840 (8th Cir. 2000) (holding location of residence and name of renter provided by anonymous informant are innocent details that do not support probable cause); *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993) (holding mere confirmation of "innocent static details" provided by a tipster about where an individual lived does not provide information about suspected criminal activity); *United States v. Gibson*, 928 F.2d 250, 253–54 (8th Cir. 1991) (finding several innocent details including address provided by anonymous informant insufficient to support warrant); *King v. State*, 736 So. 2d 1122, 1124 (Ala. Crim. App. 1997) (holding police corroboration of innocent facts readily available to the public including residence and description of vehicle did not support probable cause); *State v. Marino*, 74 So. 3d 742, 746 (La. Ct. App. 2011) (noting information regarding residence and vehicles were "innocent facts that could have been obtained by a casual observer"); *State v. St. Marks*, 59 P.3d 1113, 1120 (Mont. 2002) (finding corroboration of "innocent facts" such as physical description of house and ownership of residence insufficient to provide necessary indicia of suspicious human conduct).

N.W.2d 195 (Iowa 1979). But the contrast between *McNeal* and *Post* and this case could hardly be more striking. In *McNeal,* an anonymous informant provided information about the location of a trailer belonging to the defendant. 867 N.W.2d at 96. This information was corroborated by the police. *Id.*

Standing alone, the anonymous tip provided nothing but information about the location of a hidden trailer. *See id.* at 100–01. The anonymous tip provided no information about veracity and no information about knowledge of criminal activity. *See id.* at 96. The location of the trailer was corroborated by police simply traveling to the location and finding the trailer. *Id.* at 101 (noting that the officer independently verified three of the four components in the tip).

The anonymous affidavit in *McNeal* did not provide probable cause to search the trailer. It only provided the location of the trailer. Probable cause to search was provided by a different named informant. *Id.* at 103–04. The named informant told police that he was directly involved in stealing property from construction sites and selling it to the defendant. *Id.* at 96. The named informant further told police that the defendant had stated that he moved the stolen property away from his residence and that a trailer was in a remote rural area, enclosed, and large enough to store the items. *Id.* Thus, while the anonymous tip provided no information about the location of a trailer, the named informant provided information about the criminal activity that would justify the search of the trailer.

Under these circumstances, the *McNeal* court held there was probable cause to search the trailer. *Id.* at 102–05. In summary, in *McNeal,* a named

informant provided detailed—against penal interest—personal knowledge of criminal activity by the person whose property was to be searched, while the anonymous informer merely provided the location of the trailer, a fact that could be corroborated. The statements made by the two informants, one anonymous and another named, provided dramatically richer information about the possibility of criminal activity than the four anonymous and conclusory "will not do" statements made by informers in this case.

The State's second case is similarly distinguishable. In *Post*, the suspect was charged with burglary after a search warrant executed on his property found evidence of stolen goods. 286 N.W.2d at 198. As part of the search warrant application, statements from a named informant—a mechanic employed in Post's repair shop—were used to support probable cause. *Id.* The named informant's statements were found credible as a concerned citizen because he saw the goods trafficked through the shop and therefore had personal knowledge. *Id.* The named informant also stated that he had contact with the suspect and knew the suspect personally. *Id.* at 198–99.

This case is not remotely similar to *Post*. Unlike in *Post*, the informants here are not identified, did not state how they learned about Bracy's dealing in methamphetamine, and provided no demonstration of personal knowledge as to Bracy's involvement in the drug trade. While the State claims that "reliability of a citizen informant may be shown 'by the very nature of the circumstances under which the incriminating information became known,' " *id.* at 200 (quoting *State v. Drake*, 224 N.W.2d 476, 478 (Iowa 1974)), here, the warrant application did

not provide any circumstances demonstrating how the incriminating information became known to the informants.

The State's anonymous informants provide nothing more than a naked allegation of criminal activity and knowledge about where the defendant resided. The police already knew where Bracy lived, which was no secret. The anonymous informants added nothing of substance to the warrant application other than to suggest that the State was aware of the weakness of its warrant application and sought to shore it up with conclusory "will not do" statements.

Under *McNeal*, the information from the four anonymous informants should be disregarded in its entirety. Like other conclusory statements in fact-bound settings, the information literally has no value. The court should proceed to consider whether the warrant application, without the anonymous informant material, was sufficient to support a finding of probable cause. *See State v. Carter*, 889 P.2d 354, 357 (Or. Ct. App. 1995).

**C. Criminal History of Suspect.** The warrant application noted that Bracy had a prior criminal history. Bracy was convicted of possession with intent to deliver in August 2014, a weapons conviction in October 2015, and possession of methamphetamine in January 2017—about a year and a half prior to the filing of the warrant application in this case.

An individual's prior criminal record may be a valid consideration in a search warrant application. *McNeal*, 867 N.W.2d at 102 (citing *State v. Hoskins*, 711 N.W.2d 720, 727 (Iowa 2006) (considering officer's knowledge of suspect's prior theft conviction in determining whether there was probable cause to justify

search); *State v. Poulin*, 620 N.W.2d 287, 290 (Iowa 2000) (en banc) (considering defendant's prior conviction in determining whether there was probable cause to support the issuance of a search warrant); *State v. Padavich*, 536 N.W.2d 743, 748 (Iowa 1995) (noting that several factors, including "a suspect's history of involvement in the drug trade," may be considered in determining whether there is probable cause to support the issuance of a search warrant)). This court has noted that "[t]he use of such information is common in law enforcement and is of some . . . value in the ultimate determination of probable cause." *Id.* at 102.

Yet, many courts have held that knowledge of a suspect's criminal history alone will not provide probable cause. *See State v. Vigh*, 871 P.2d 1030, 1033 (Utah Ct. App. 1994) ("Stale information such as prior convictions cannot be the sole basis for determining that probable cause exits."); *see also State v. Kimbro*, 496 A.2d 498, 505 (Conn. 1985), *overruled in part on other grounds by State v. Barton*, 594 A.2d 917, 926 (Conn. 1991); *People v. Sundling*, 395 N.W.2d 308, 311–13 (Mich. Ct. App. 1986), *abrogated on other grounds by People v. Russo*, 487 N.W.2d 698, 706 & n.31 (Mich. 1992). Prior convictions may be a factor, depending upon the totality of the circumstances, but they cannot be dispositive. Otherwise, thousands of convicted felons would be subject to search and seizure without a showing of particularity pursuant to the equivalent of a general warrant.

Although there are no mathematical rules, the greater the age of the conviction, the less impact it has on the probable cause determination. The court of appeals has noted that "[t]he relevance of the prior drug convictions, and their

underlying facts, necessarily fades with time." *State v. Kolbeck*, No. 04–0376, 2005 WL 157382, at \*4 (Iowa Ct. App. Jan. 26, 2005). It has also been observed that staleness generally is a highly relevant factor in applications for search warrants because, unlike arrests, the focus is on whether evidence of a crime will be found in a particular place and often involves a search for a perishable or transportable object like drugs or guns. *United States v. Haldorson*, 941 F.3d 284, 292 n.4 (7th Cir. 2019).

Here, the most recent of Bracy's previous criminal convictions was a possession conviction that occurred over a year and a half prior to the search warrant application. We do not know where he possessed the drugs. There was certainly no indication that he possessed the drugs at his father's house. The act of possession underlying the conviction likely occurred sometime before the conviction. Under all the circumstances, the fact that Bracy may have engaged in illegal conduct more than a year and a half ago is a slender reed to assume that he is now engaged as a methamphetamine dealer from his father's home. *See State v. Cartee*, 844 S.E.2d 202, 207 (Ga. Ct. App. 2020) (noting tip was stale where informant had not been inside home where marijuana operation was said to be located during the past two years); *State v. Probst*, 795 P.2d 393, 398 (Kan. 1990) (noting that a single conviction, fifteen months in the past, would not be sufficient by itself to establish probable cause that drugs would be at a specific location); *Carter*, 889 P.2d 359 (rejecting probable cause based on information more than a year old). Bracy's prior conviction of possession with intent to deliver

may seem somewhat more germane, but it is also five years old, a diminishing factor.

A significant factor in determining whether prior convictions are too stale to support probable cause is whether there is evidence of continuing criminal conduct. *People v. Rehkopf,* 506 N.E.2d 435, 438 (Ill. App. Ct. 1987). If so, it may be reasonable to assume that activity that occurred a few days ago, or a few weeks ago, or maybe even, under the right circumstances, a few years ago, may be of some value in determining the presence of probable cause on a continuing violation theory.

But here, there is no substantial showing of ongoing criminal activity in the material the magistrate may consider. The four anonymous affidavits present only conclusions and cannot be considered by the magistrate. The only information of any potential bearing on the continuing crime issue is contained in the substance of the telephone calls that police overheard from the jailhouse. As will be seen in more detail below, the jailhouse conversations reveal that there may be money—because of the use of the term "shit" by Bracy—in the safe. But there is nothing in the jailhouse conversations to demonstrate a continuing criminal act. There is no indication of the amount of money or drugs in the safe, but only that something valuable may be located in the safe.

In sum, because of the limited value of convictions generally, the passage of time, and the lack of evidence of ongoing criminal activity, Bracy's criminal convictions have limited persuasive power on the question of probable cause.

And, without question, the mere existence of these stale criminal convictions, in and of themselves, do not support a finding of probable cause.

**D. The Overheard Jailhouse Telephone Conversations Using the Word "Shit."** I now turn to the narrative in the warrant application regarding two jailhouse conversations—one between Bracy and his father and the other between Bracy and his girlfriend. As noted above, in the conversation with his father, Bracy is said to have declared, "[D]on't let nothing happen to my safe man. There is a lot of money in that safe. That's where everything is." On its face, Bracy is concerned about an unspecified amount of money in the safe in his father's house where "everything is."

Then, a few hours later, there is a conversation on the phone line belonging to his girlfriend, where a female voice declared, "[D]o you know how much shit I have gone through to get your debt paid off?" We have no idea what the term "shit" means in this sentence, nor do we know the nature of Bracy's debt. But, it looks like Bracy's girlfriend has provided him with assistance, perhaps money, to help Bracy meet financial obligations of some kind. Bracy then is said to respond, "[I]t's like I told him [an apparent reference to the recent conversation with his father], all the shit is right there from my dads house." The phrase "like I told him" seems to refer to the earlier conversation with his father that was explicitly about *money* in the safe.

And there you have it. Bracy engaged in an explicit conversation with his father about money in the safe. In a conversation shortly thereafter, his girlfriend makes a reference to the "shit" she has gone through. And, Bracy then uses the

term "shit" in a sentence directly linked to his earlier conversation with his father about money in the safe. Perhaps, the majority presumes that people like Bracy would not have any savings or anything of value to keep in a safe other than drugs. I would not go that far.

This would be thin gruel for a conscientious magistrate. The State asserts that in its appellate brief the term "shit" as used by Bracy suggests drugs, but even Detective Bowermaster, with all his years of experience, did not claim that Bracy was referring to methamphetamine during the jailhouse calls in the warrant application. Detective Bowermaster stated only generally that "I know from experience that people often refer to meth as 'shit.'" Detective Bowermaster made no claim in the warrant application that he thought, based on experience or expertise, that the term was used by Bracy to signify drugs. Instead, Detective Bowermaster offers a much more limited statement, namely, that "people" often use the term "shit" to describe methamphetamine.

Perhaps so. But all of us know from our daily experience that people often use the term "shit" in many different ways and to connote many different things. As a noun, the term is quite flexible. Consider a few examples in literature:

> "Shit is the tofu of cursing and can be molded to whichever condition the speaker desires. Hot as shit. Windy as shit . . . ."

David Sedaris, *The Best of Me* (2020);

> "Put your shit away . . . . Put it in your bag. Don't be leaving it all out."

Matthew Aaron Goodman, *Hold Love Strong* 65 (2009).

> " 'I keep all my shit up here,' Denny explained . . . . By his left hand was an army compass, a green shirt (with gold trim), . . . a dagger whose handle was a ball-in-claw, and a gaming case . . . ."

Samuel Ray Delany, *Dhalgren* 433 (1975).

> "I don't have enough room for all his shit down here. He's got a stack of comic books five feet high."

Casey Kurtti, *Three Ways Home: A Drama in Two Acts* 15 (1989).

While these quotes are from literature, no one can doubt the utility of the term in the common vernacular. "I got my shit together." "I got the shit kicked out of me." "Bring your shit with you." "You shit!" "Grab that shit over there!" "Shit" is a general vulgar term used to describe stuff—good, bad, and in between. And, no one should be surprised that there are many cases where "shit" is used as a noun meaning money. *See, e.g.*, *People v. Grace*, B249353, 2014 WL 3667234, *2 (Cal. Ct. App. July 24, 2014) (featuring the phrase "[t]he money, all this money shit ain't worth it"); *People v. Crawford*, No. D054954, 2009 WL 3184634 (Cal. Ct. App. Oct. 6, 2009) (noting defendant states that victim "owed him some money, some shit like that"); *People v. Lindsey*, 994 N.E.2d 194, 199 (Ill. App. Ct. 2013) (noting perpetrator points gun, yelling "give me the shit," meaning "money"); *State v. Hill*, 228 P.3d 1027, 1038 (Kan. 2010) ("Watch out for my two kids[,] Sly[,] please[,] in money, clothes shit like that."); *Turner v. State*, No. 2461, 2021 WL 1546939, at *5 (Md. Ct. Spec. App. April 20, 2021) (referring to "my whole lawyer money shit"); *Hardin v. Haney*, No. 3:07CV–79–H, 2007 WL 2023575, at *3 (W.D. Ky. July 6, 2007) (noting that petitioner told "to give him 'all the shit' " refers to money). The ambiguous use of the term "shit" simply cannot be a general admission ticket to a search and seizure experience.

An objective evaluation of the two snippets of conversation in the warrant application suggests that the use of the term "shit" by Bracy to his girlfriend was in reference to money he kept in a safe at his father's house, not drugs. The use of the term "shit," in context, offers at best only highly speculative support for a search of Bracy's residence.

**E. Boilerplate Language of Warrant Application.** The purported habits of drug dealers are not probable cause to search a particular residence as there must be a nexus between the particular facts of a case to criminal activity to support a warrant. *See* John Wesley Hall, Jr., *Search and Seizure* § 3:13 (3d ed. 2000) (discussing *United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994)). Roughly 70% of the warrant application was boilerplate language about the habits of drug dealers that did not specifically relate to Bracy.

Many courts and commentators have been critical of boilerplate language in search warrants. As noted by one district court, " 'Rambling boilerplate recitations [in a search warrant affidavit] designed to meet all law enforcement needs' do not produce probable cause." *United States v. Zimmerman*, 277 F.3d 426, 433 n.4 (3d Cir. 2002) (quoting *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990)); *see also Herron v. State*, 44 N.E.3d 833, 836 (Ind. Ct. App. 2015) (rejecting nonparticularized boilerplate as supporting probable cause in drunk driving case); *State v. Wasson*, 615 N.W.2d 316, 320–21 (Minn. 2000) (en banc) (rejecting boilerplate in context of application for no-knock warrant). *See generally* Shayna Bartow, *Suspects Use Cell Phones, But So Do We:* State v. Goynes *and the Constitutional Dangers of Boilerplate Search Warrants*, 99 Neb.

L. Rev. 477 (2020) (discussing dangers of relying on general boilerplate language to supplement traditional particularity and nexus requirements in the context of cell phone searches). In any event, no reasonable person could find that this boilerplate language offers much support for establishing probable cause to search Bracy's residence and the automobiles associated with him. For example, it is noted that drug dealers often have funds stored in safes at home, but so do lots of other people. The boilerplate language simply states things drug traffickers typically do in the course of drug conspiracies without alleging Bracy is doing anything of the sort. At most, the boilerplate language may have some bearing on the scope of the search, but it does not provide probable cause for the underlying search itself. With respect to the search itself, there is not much there in the boilerplate language.

**F. Totality of Circumstances.** The majority believes that the warrant application must be read as a whole and should not be subject to "piecemeal appraisal." Yet, reading what we have in the warrant application as a whole, the facts presented are still too thin for a magistrate to allow the police to search a person's dwelling.

Based on the above discussion, police had a hunch, perhaps, that Bracy may be involved in drug activity. There was a basis for suspicion. But probable cause requires more. The material submitted to the magistrate showed that Bracy was convicted of drug offenses in the past and, when incarcerated on unrelated charges, was concerned about the safety of money or "shit" in a safe at his father's home. This speculative material might have been enough to cause

police to investigate. But it was plainly insufficient to provide probable cause to search Bracy's home under applicable search and seizure principles.

In the end, this court must recognize the difference between the tripartite concept of probable cause, reasonable suspicion, and mere hunches. We rely on traditional search and seizure authority. "[M]ere suspicion, rumor, or even 'strong reason to suspect' a person's involvement with criminal activity is inadequate to establish probable cause." *State v. Seager*, 341 N.W.2d 420, 427–28 (Iowa 1983) (citing *Henry*, 361 U.S. at 101). As a result, the evidence obtained must be suppressed under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (holding that allowing a vague suspicion to be transformed into probable cause was the "essential vice" the Court had consistently rejected).

**IV. Conclusion.**

For the above reasons, I conclude that the magistrate erred when it found probable cause to search Bracy's residence. I would therefore reverse the judgment of the district court and remand the case.

Oxley and McDermott, JJ., join this dissent.